UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>HERIBERTO CARBAJAL-FLORES | No. 20 CR 613<br><br>Judge Sharon Johnson Coleman |

**GOVERNMENT'S RESPONSE TO
DEFENDANT'S MOTIONTO DISMISS**

The United States of America, by JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, hereby responds to Defendant's Motion to Dismiss and Supporting Memorandum, as follows:

I. **Introduction**

On September 10, 2020, the grand jury returned a federal indictment charging defendant with possession of a firearm while being illegally or unlawfully in the United States, in violation of Title 18, United States Code, Section 922(g)(5)(A) "(§ 922(g)(5)(A)"). On November 26, 2021, defendant filed a motion to dismiss the indictment, claiming that § 922(g)(5)(A) is unconstitutional. Defendant's motion is without merit — § 922(g)(5)(A) has repeatedly withstood the same constitutional challenges defendant raises here.

In deciding a motion to dismiss, all facts in the indictment should be taken as true and viewed in a light most favorable to the government. *United States v. Yashar*, 166 F.3d 873, 880 (7th Cir. 1999). Given that the jury is the factfinder, any arguments in a motion to dismiss that rely on disputed facts must be rejected at the pretrial motion stage. *United States v. Shriver*, 989 F.2d 898, 906 (7th Cir. 1992); *United*

1

*States v. Caputo*, 299 Fed. Supp. 912, 916 (N.D. Ill. 2003). Taking the facts alleged in this indictment as true, defendant's motion to dismiss should be denied.

II.     **Factual Background**

Upon his arrival from Mexico when he was approximately 9 years old, defendant, his mother and his sister settled in an area on the Southwest side of the City known as Little Village. Defendant continued to live there into early adulthood. However, on June 1, 2021, the night of his arrest, defendant did not live in Little Village. At that time, defendant lived in suburban Cicero, Illinois, with his then-girlfriend and their children.

On June 1, 2021, in the wake of the killing of George Floyd in Minneapolis, Minnesota, Chicago and the rest of the country experienced widespread protests and, unfortunately, periods of violence and looting, including in the Little Village neighborhood. Defendant did not go home to his family in Cicero that night but was on the streets of Little Village. A City run "POD" camera (a "Police Observation Device") captured relevant portions of defendant's conduct on the street that night. The POD camera footage runs from approximately 9:30 to 11:50 pm, but in the interest of expediency, the government has submitted footage from approximately 10:30 pm to approximately 11:50 pm as Exhibit 1 hereto.

Defendant first was captured on a POD camera around 9:33 pm, on the corner of South Kostner Avenue and West 30th Street in Chicago. Defendant came and went and was not present for much of what he recounts in his memorandum until approximately 10:32 pm. His claim that someone on the street gave him a gun at

around 9:53, if it happened that way, is not captured on video. Nevertheless, he has admitted possession of the gun as of that time, which constitutes the crime of possession with which he is charged. Defendant's Renewed Motion, ¶15.

At approximately 10:33, a white van with police arrived at the intersection of 30th Street and Kostner Avenue, which is when defendant claims that the police "deputized" him. Defendant's Renewed Motion, ¶17. The video shows that as the police van had almost cleared the intersection, defendant walked halfway into the crosswalk but never went up to the van. At approximately 10:33:10, defendant called out to the van from the crosswalk and the van drove away at approximately 10:33:22. During those twelve seconds, defendant claims that the police deputized him, and essentially immunized him from federal law that he knew prohibited him from possessing a gun. Defendant's Memorandum p. 11.

Whether the officers in the van "deputized" defendant and immunized him from criminal liability for a violation of § 922(g)(5)(A) is in dispute and thus cannot be the basis of a motion to dismiss. Still, it is a meaningless dispute because defendant concedes that he already had a gun prior to being deputized – he admitted in his memorandum that he had the gun as of 9:53 pm and he did not talk to the police in the white van until 10:33, so he concedes that he did not arm himself in response to a police order.

Armed with a firearm, defendant was next captured on the POD camera at approximately 11:00 pm, when a "ShotSpotter" alert detected seven shots fired near 30th Street and Kostner Avenue. A CPD Officer monitoring the camera observed a

male in a black shirt with a red logo, now known to be defendant, arm outstretched in a shooting stance with a gun in hand pointing directly at passing cars, shooting multiple rounds at a white car that already had passed through the intersection. The still image below left shows the defendant in a shooting stance, arm outstretched with gun in hand, shooting directly at the car. We do not know if defendant hit the passing car, because the occupants understandably did not stop and check for damage in light of an active shooter feet away.




Defendant admits that he did not shoot at the passing car in response to the threat of a gun pointed at him or anyone else; rather, he admits that he shot at the passing car in response to it "swerving." Defendant's Renewed Motion ¶20. He also claims that he was merely shooting warning shots, a claim that is belied by the video and, in any event, would not change the fact that he was in illegal possession of the gun. After the shooting, defendant placed the gun in his right front pants pocket (above right) and left the scene. The officer monitoring the camera dispatched officers to the scene of the shooting, but the defendant was gone by the time they arrived.

At approximately 11:38 p.m., defendant returned to the intersection, and, as seen in the below still, stood in the cross walk with the gun in his right hand, despite no threat to him or others at that time:



Defendant and other men circled the corner, with the other young men waving baseball bats at passing cars. Only defendant brandished a gun, which he periodically put in and out of his front right pants pocket. With no threat or confrontation, defendant kept the gun on him, at the ready for shooting.

At approximately 11:41 p.m., defendant watched a car drive by. *After* the car drove through the intersection, defendant pulled the firearm from his right-pants' pocket and pointed it at the car, as seen below. He pulled the trigger repeatedly as he pointed it at the car, although it appears that the gun jammed.



Defendant then placed the firearm back into his right-pants' pocket, casually walked away and sat on the stoop of a nearby residence.

At no time does the video show any of the occupants in any of the passing cars brandish, point or shoot a gun at defendant or anyone on the street. Defendant admits that nobody in the first car (the car that he shot at seven times) showed any gun, but instead claims that he shot because the car "swerved." Defendant's Renewed Motion, ¶20. Defendant shot at these cars after they had passed, after any purported threat would have been over. Moreover, the charge against defendant in this case is for possession of a gun, which might make his purported reasons for shooting relevant at sentencing but are wholly irrelevant to whether the indictment here charges a valid crime of illegal possession.

At approximately 11:43 p.m., arresting officers dispatched by the POD monitor arrived on the scene. The first officer to reach defendant performed a pat down and retrieved the gun from defendant's right-pants' pocket. The officers placed defendant under arrest. In the meantime, officers recovered seven spent shell casings from the

area where defendant first was observed shooting. The shell casings were consistent with being expelled by defendant's gun.

After being advised of his *Miranda* rights, defendant agreed to answer questions. Defendant initially denied falsely that he had shot the gun, claiming that someone had the gun before him, implying that person was the shooter. Defendant admitted to knowing that he had no legal status in the country. Defendant claimed that he had never bothered to seek legal status because he "just lived his life." Unfortunately, because his life included illegal possession of (and shooting) a gun, the grand jury returned a federal indictment charging defendant with possession of a firearm while being in the country without legal status, in violation of Title 18, United States Code, Section 922(g)(5)(A).

### III. The Court Should Deny Defendant's Motion to Dismiss

Title 18 United States Code Section 922(g)(5(A) provides that it shall be unlawful for any person who, being an alien illegally or unlawfully in the United States, to "possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." Here, the indictment alleges that on June 1, 2020, defendant, knowing that he was an alien illegally and unlawfully in the United States, did "knowingly possess in and affecting interstate and foreign commerce, a firearm, namely, a loaded Raven Arms MP-25 .25 caliber semi-automatic pistol bearing serial number 6g417g, which firearm had traveled in interstate commerce prior to

defendant's possession of the firearm" in violation of Title 18, United States Code, Section 922(g)(5)(A). Docket No. 1. The indictment tracks the statutory elements.

Defendant advances four arguments in support of his claim that the charges here are unconstitutional. First, defendant claims that the Second Amendment extends him the absolute and unfettered right to carry a firearm for self-defense, and that he was using the firearm for self-defense. Second, defendant argues that Congress lacked the authority under the Commerce Clause to pass 18 U.S.C. § 922(g)(5)(A). Third, defendant argues that 18 U.S.C. § 922(g)(5)(A) violates the Equal Protection Clause. Fourth, defendant argues that the charges here violate due process because, in possessing the firearm, defendant was obeying a police order to arm himself. None of these arguments have merit. None of these arguments support a motion to dismiss.

A. The Seventh Circuit Has Upheld the Constitutionality Of 18 U.S.C. § 922(G)(5)(A) As A Reasonable Limitation on The Second Amendment.

Defendant argues that 18 U.S.C. § 922(g)(5) impermissibly infringes on his rights under the Second Amendment to bear arms. The Seventh Circuit rejected precisely this argument in *United States v. Meza-Rodriguez*, 798 F.3d 664, 668-72 (7th Cir. 2015). While holding that the defendant in that case had the ability to invoke the Second Amendment, it held that the Supreme Court's decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008), does not recognize an unlimited right to bear arms. Instead, consistent with *Heller,* 554 U.S. at 595, Congress may circumscribe this right, with an example of such a permissible restriction being 18 U.S.C.

§ 922(g)(5)'s prohibition on an "alien" "who is unlawfully or illegally within the United States" possessing a firearm. *Meza-Rodriguez*, 798 F.3d at 672-73.

Specifically, *Meza-Rodriguez* held that the ban in § 922(g)(5)(a) is substantially related to the statute's general objectives. *Meza-Rodriguez*, 798 F.3d at 673. Because "unauthorized noncitizens often live 'largely outside the formal system of registration, employment, and identification, [and] are harder to trace and more likely to assume a false identity,'" the Court explained, they "will be more difficult to keep tabs on than the general population." *Id*. Congress, in turn, has a sufficiently strong "interest in prohibiting persons who are difficult to track and who have an interest in eluding law enforcement," supporting "the conclusion that 18 U.S.C. § 922(g)(5) does not impermissibly restrict [a defendant's] Second Amendment right to bear arms."[1] *Id*.

The Seventh Circuit in *Meza-Rodriguez* also addressed the government's argument that § 922(g)(5)(A) reflects the likelihood that unauthorized immigrants are more likely to commit future gun-related crimes than persons in the general population. The Court, noting that the government offered no data in support of this argument, expressed doubts about its accuracy. *Meza-Rodriguez*, 798 F.3d at 673. Still, the Court held that, "[e]ven if this future-oriented rationale lacks support,

---

[1] Defendant proposes a new unwritten element to § 922(g)(5)(A): "when the government indicts a noncitizen for violation of 18 U.S.C. § 922(g)(5)(A), the indictment must be dismissed unless the government can show that the indictment substantially furthers its interests in keeping guns out of the hands of 'presumably risky people.'" Defendant's Memorandum, p. 4. Defendant's proposed change to § 922(g) is absurd, presuming dismissal in the absence of an immediate individualized and likely factual showing for each indictment. Apparently, the defendant recognizes that in the absence of rewriting the statute, he cannot prevail on this motion.

however, the government has a strong interest in preventing people who already have disrespected the law. . . from possessing guns." *Id*.

Defendant claims that the rationale of *Meza-Rodriguez* does not apply to him because he personally, unlike others unlawfully in the country, is not difficult to track.[2] Even if defendant could prove this to be true, it is irrelevant: Defendant belongs to the class of persons illegally and unlawfully in the United States, who are prohibited by § 922(g)(5)(A) from possessing a gun. As *Meza-Rodriguez* holds, a prohibition on this class as a whole possessing firearms is constitutional. Indeed, *Heller* specifically carved out exceptions for "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms," 554 U.S. at 626-27 (citations omitted). Although *Heller* did not specifically address whether a person in the country without legal status has the right to possess and carry a firearm

---

[2] Defendant suggests that he is easily tracked because his grandfather started (but subsequently abandoned) an I-30 Petition on behalf of his mother, listing defendant as a derivative beneficiary. Defendant's Memorandum, p. 7, Defendant's Exhibit 2. An I-30 Petition allows a U.S. citizen or lawful permanent resident to apply for an eligible relative to come to or remain in the United States permanently and get a Permanent Resident Card (also called a Green Card). https://www.uscis.gov/i-130 (last visited January 7, 2022). The I-30 Petition here, signed when defendant was about 9 years old and apparently still living in Mexico, tells the government little about defendant as an adult. Moreover, the petition is not relevant to the legal motion to dismiss here, where it does not change defendant's status as being illegally and unlawfully in the United States. The undisputed fact is that defendant, arrested at 29 years old after being in the country 20 years, had never availed himself of any avenues to achieve legal status in the United States. Rather, the government expects that in a hearing on his status, the evidence of his use of aliases and his conviction for obstructing identification will show that he took affirmative steps to sidestep his unlawful status.

under the Second Amendment, the Court contemplated that, generally, a class-wide prohibition, like that imposed by § 922(g)(5), is permissible. *Id.*

Defendant nonetheless claims that he has the right to possess a weapon for self-defense and as part of a militia. He does not. *Meza-Rodriguez* found to be constitutional the categorical bar in § 922(g)(5) on aliens unlawfully or illegally within the United States possessing weapons, no matter the circumstances; there is no statutory exception for self-defense, and the Seventh Circuit did not read such an exception into the law in order to make the restriction constitutional. The law is constitutional even absent such an exception. This disposes of defendant's Second Amendment claim, and his motion to dismiss on this ground should be rejected on that basis alone.[3]

But even if *Meza-Rodriguez* were incorrectly decided, which it was not (or this court had the authority to disregard *Meza-Rodriguez,* which it does not), defendant cannot establish that he was actually acting in self-defense at this pretrial stage, and likely not even at trial. The government expects that the evidence at trial will show

---

[3] There also is a strong argument that, as other circuits have concluded, the Second Amendment does not protect unauthorized noncitizens within our borders. Unauthorized noncitizens categorically have not accepted the basic obligations of membership in U.S. society and thus cannot be considered as part of "the people." *United States v. Carpio-Leon*, 701 F.3d 974, 978 (4th Cir. 2012) (noting the *Heller* Court's use of the term "Americans" frequently connects arms-bearing and "citizenship"); *Huitron-Guizar*, 678 F.3d at 1168 (10th Cir. 2012) ("although the [*Heller*] Court did not face the question before us, it is not exactly reading between the lines to note how frequently the opinion connected arms-bearing and citizenship . . ." and noting the reference to "Americans" is a "signal example" of "connecting citizenship and the right to bear arms."); *United States v. Portillo-Munoz*, 643 F.3d 437, 442 (5th Cir. 2011); *United States v. Flores*, 2011 WL 6266033 (8th Cir. 2011). *see also United States v. Meza-Rodriguez*, 798 F.3d 664, 673 (7th Cir. 2015) (Flaum, J., concurring) (expressing "doubts that the Second Amendment grants undocumented immigrants the right bear arms, as my read of [*Heller*] does not suggest such an expansive interpretation"). This court need not reach that issue to resolve defendant's motion to dismiss here.

that defendant did not possess the firearm that is charged here for purposes of self-defense or any lawful purpose. The video submitted as Exhibit 1 shows that defendant used the gun to aggressively shoot at passing cars even though there was no lethal threat from the passing cars at the time defendant did the shooting. The video shows defendant, essentially, committing an aggravated assault. The Second Amendment was not intended, under any circumstances, to empower defendant to shoot at occupants in passing cars on the public street who pose no lethal threat. In addition, defendant did not possess the firearm lawfully: He did not have a valid FOID card, the firearm was not registered to him, and he admittedly obtained the firearm in an illegal street transaction. That alone precludes defendant's hypothetical arguments about how § 922(g)(5) would unfairly encompass "cap guns, chemistry sets and an undocumented boy scout working on his riflery merit badge." Defendant's Memorandum, p. 21. *See* , *See United States v. Skoien*, 614 F.3d 638, 645 (7th Cir. 2010) ("A person to whom a statute properly applies can't obtain relief based on arguments that a differently situated person might present").

Defendant's claim that he was acting as part of an "organized militia," a group acting in concert for common defense of domestic security and tranquility, also does not merit dismissal of the indictment. Defendant's Memorandum, pp. 8-10. If relevant, the government expects that defendant will not be able to prove at trial his tale that he was part of a lawful militia, because it is wholly contrary to the objective facts as reflected by the video. Moreover, for purposes of the motion to dismiss, it is

12

irrelevant to the constitutional validity of § 922(g)(5) as resolved by the Seventh Circuit.

## B. 18 U.S.C. § 922(g)(5)(A) Is A Valid Exercise of Congress's Authority Under the Commerce Clause.

The Commerce Clause of the United States Constitution empowers Congress "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. 1, § 8, cl. 3. Pursuant to the Commerce Clause, Congress may regulate three broad categories of activity: (1) the use of channels of interstate commerce; (2) instrumentalities of interstate commerce; and (3) activities that substantially affect interstate commerce. *United States v. Lopez*, 514 U.S. 549, 558-59 (1995).

The indictment charges defendant with violating § 922(g)(5), which prohibits an alien illegally or unlawfully within the United States from possessing a firearm "in or affecting commerce." By its plain terms, the charge in this case implicates the third *Lopez* category: activities that substantially affect interstate commerce.

It is settled law that Congress acted within its authority under the Commerce Clause in passing § 922(g)(5)(A). *See United States v. Bass*, 404 U.S. 336, 342 (1971). As the Seventh Circuit explained in *United States v. Williams*, 410 F.3d 397, 400 (7th Cir. 2005), in rejecting a similar Commerce Clause challenge to a § 922(g)(1) charge:

> [O]ur precedents foreclose his argument . . . It suffices to note that we have held repeatedly that section 922(g)(1), because it requires proof that the defendant possessed a firearm "in or affecting commerce," represents a valid exercise of congressional authority under the Commerce Clause. We have also

held that so long as the firearm crossed state lines at any point prior to the defendant's possession of the gun, his possession is "in or affecting commerce."

Likewise, in *United States v. Lemons*, 302 F.3d 769, 772 (7th Cir. 2002), the Seventh Circuit explained: "Because 922(g) itself contains a jurisdictional element, and because the Supreme Court . . . suggested that prior movement of the firearm in interstate commerce would suffice to meet that element, we have . . . repeatedly rejected Commerce Clause challenges to application of [922(g)]." This forecloses defendant's challenge. The jurisdictional requirement is the same for all subsections of § 922(g): the defendant must have possessed a firearm "in or affecting commerce," a requirement that the Seventh Circuit repeatedly has held makes the statutory prohibitions a valid exercise of congressional authority.

Defendant's reliance on *Lopez*, 514 U.S. 549 (1995), and *United States v. Morrison*, 529 U.S. 598 (2000), is misplaced. In *Lopez*, the Supreme Court held that the Gun-Free School Zones Act of 1990, which prohibited the possession of a firearm within 1000 feet of a school, exceeded congressional authority under the Commerce Clause. In *Morrison*, the Court found that the Violence Against Women Act exceeded Congress's authority under the Commerce Clause. But in those cases, unlike here, "the statute[s] lacked a jurisdictional element 'which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce.'" *Lemons*, 302 F.3d at 772 (quoting *Lopez*, 514 U.S. at 561). By contrast, *Lopez* itself cited the forerunner to § 922(g), which the Supreme Court in *Bass* had construed to require proof of just that kind of nexus to interstate commerce. *Id*.

Finally, defendant argues, with no legal support, that his personal actions were intrastate, and therefore his actions did not affect interstate commerce. Defendant's Memorandum p. 15. This same argument was rejected in *United States v. Latu*, 479 F.3d 1153 (9th Cir. 2007): "The *de minimis* character of each individual possession is irrelevant where, as in this case, possession is regulated as part of a general regulatory statute that substantially relates to interstate commerce in firearms." 479 F.3d at 1156-57.

Essentially, defendant's arguments that § 922(g)(5(A) is unconstitutional under the Commerce Clause are simply retreads of the same arguments that have been rejected by the courts time and time again (yet, inexplicably, defendant fails to bring this plethora of contrary authority to the court's attention). Defendant's Commerce Clause arguments are spurious and should be rejected summarily.

C. **Section 922(g)(5) Does Not Violate the Equal Protection Clause**

Defendant argues that the restriction in 18 U.S.C. § 922(g)(5) violates the Equal Protection Clause. He is incorrect.

"Federal statutes that classify based on alienage need only a rational basis." *United States v. Huitron–Guizar,* 678 F.3d 1164, 1167 (10th Cir. 2012), *cert. denied,* ––– U.S. ––––, 133 S.Ct. 289, 184 L.Ed.2d 170 (2012). This is because they flow from plenary powers over admission, exclusion, naturalization, national security, and foreign relations. *Mathews v. Diaz,* 426 U.S. 67, 79–80 (1976). Accordingly, "[i]n the exercise of its broad power over naturalization and

15

immigration, Congress regularly makes rules that would be unacceptable if applied to citizens." *Demore v. Kim*, 538 U.S. 510, 521-22 (2003).

Defendant's argument has been rejected by other circuits. For example, in *United States v. Huitron-Guizar*, 678 F.3d 1164, 1167 (10th Cir. 2012), the Tenth Circuit held that the defendant could not meet his burden of showing that there is no rational relationship between the classification and a legitimate government end. The Court explained that "[e]qual protection requires that similarly situated individuals be treated similarly; aliens, let alone those unlawfully here, are simply not situated like citizens." *Id*. The *Huitron-Guizar* Court reasoned:

> Congress may have concluded that illegal aliens, already in probable present violation of the law, simply do not receive the full panoply of constitutional rights enjoyed by law-abiding citizens. Or that such individuals, largely outside the formal system of registration, employment, and identification, are harder to trace and more likely to assume a false identity. Or Congress may have concluded that those who show a willingness to defy our law are candidates for further misfeasance or at least a group that ought not be armed when authorities seek them. It is surely a generalization to suggest, as courts do, *see, e.g., United States v. Orellana*, 405 F.3d 360, 368 (5th Cir.2005), that unlawfully present aliens, as a group, pose a greater threat to public safety— but general laws deal in generalities. . . . The law applies with equal force to those who entered yesterday and those who, like Mr. Huitron–Guizar, were carried across the border as a toddler. The bottom line is that crime control and public safety are indisputably "important" interests. Courts must defer to Congress as it lawfully exercises its constitutional power to distinguish between citizens and non-citizens, or between lawful and unlawful aliens, and to ensure safety and order. On this record, § 922(g)(5) withstands Mr. Huitron–Guizar's Second Amendment and Equal Protection challenges.

*Id*. at 1170.

Similarly, in *United States v. Carpio-Leon*, 701 F.3d 974 (4th Cir. 2012), the Fourth Circuit held that the defendant "cannot show that there is no rational relationship between prohibiting illegal aliens from bearing firearms and the

legitimate government goal of public safety." *Id*. at 982-83. "To the contrary, courts have identified numerous legitimate reasons why it would be dangerous to permit illegal aliens to arm themselves." *Id*. at 983. The court explained:

> For instance, illegal aliens are "harder to trace and more likely to assume a false identity[,] [o]r Congress may have concluded that those who show a willingness to defy our law are candidates for further misfeasance or at least a group that ought not be armed when authorities seek them." Illegal aliens are "likely to maintain no permanent address in this country, elude detection through an assumed identity, and—already living outside the law—resort to illegal activities to maintain a livelihood." More generally, the Supreme Court has "firmly and repeatedly endorsed the proposition that Congress may make rules as to aliens that would be unacceptable if applied to citizens." Congress therefore surely can rationally distinguish between legal aliens and illegal aliens.

*Id*. (citations omitted).[4]

Although an Equal Protection challenge was not raised specifically in *Meza-Rodriguez,* in the context of rejecting the defendant's Second Amendment challenge the Seventh Circuit also implicitly held that aliens illegally or unlawfully in the country are not similarly situated to citizens and that a prohibition on the possession of a firearm by an alien has a rational basis. Indeed, the Seventh Circuit readily recognized the rational basis for prohibiting certain groups, including persons illegally and without authorization in the country, from possessing firearms—that the difficulty of "keep[ing] tabs" on aliens illegally in the country as compared to the

---

[4] The Fourth Circuit characterized as "not useful" the empirical studies cited by defendant in *Carpio-Leon* to show that undocumented workers are no more dangerous to society than are native born United States citizens. "[T]he usefulness of such studies are at best limited and certainly do not focus on the class of illegal aliens, which is the basis for § 922(g)(5)." 701 F.3d at 983. It also rejected other comparisons suggested by the defendant, concluding that he "simply cannot show that Congress acted irrationally in concluding that those who are in the United States illegally should not be allowed to possess firearms." *Id*.

17

general population provides grounds to distinguish between them. *Meza-Rodriguez,* 698 F.3d at 673.

Defendant raises two arguments in support of his Equal Protection claim, neither of which have merit. First, he claims that the defendant in *Meza-Rodriguez* by "oversight" failed to raise an Equal Protection claim, leaving it open for this defendant to raise it for the first time in the Seventh Circuit. Perhaps, rather than oversight, the defendant in *Meza-Rodriguez* simply exercised care and good judgment in not rehashing an argument with substantial contrary authority; but in any event, as explained above, the Seventh Circuit's rationale for rejecting the Second Amendment claim in *Meza-Rodriguez* equally forecloses an Equal Protection claim.

Second, defendant argues that Congress's motivation for enacting § 922(g)(5)(A) was "an irrational prejudice against illegal aliens." Defendant's Memorandum, pp. 21-23. Defendant makes this broad statement about Congressional intent not from the Congressional record or any statement of Congress, but instead relies on an argument made by the government in *Meza-Rodriguez* that Congress drafted § 922(g)(5)(A) to address, among other things, the likelihood that unauthorized immigrants are more likely to commit future gun-related crimes than persons in the general population. From that, defendant claims that the government "admitted that Congress was motivated by an irrational prejudice when it enacted [§] 922(g)(5)(A)." Defendant's Memorandum, p. 22.

There was no admission or concession regarding animus, and the argument itself does not reflect animus. The government's argument in *Meza-Rodriguez* was

not that Congress acted irrationally, but that it acted due to several valid public safety interests. Other courts of appeals have held that these public safety concerns include that those unlawfully in the country are more likely to commit crimes, including gun crimes. *E.g., Huitron–Guizar,* 678 F.3d at 1167. In addressing this argument on appeal, the Seventh Circuit expressed doubt as to the link between firearms and being in the country unlawfully but—far from concluding that the argument reflected animus—nonetheless recognized the government's "strong interest in preventing people who have already disrespected the law . . . from possessing guns." *Meza-Rodriguez*, 798 F.3d at 673.

D. **Defendant's Claim That He Was Obeying a Police Order to Arm Himself is Factually False and Legally Meaningless**

Defendant argues that due process requires that enforcement of a law be rational, and that it is irrational to punish defendant for "obeying a police order" to arm himself. Defendant's Motion, ¶30; Defendant's Memorandum, p. 23. Defendant's argument falls far short of supporting a motion to dismiss.

First, even if true, defendant's version of the facts does not provide a defense. He has not established that the purported police "order" on the street, allegedly given by a local officer passing by in a car, absolves defendant from criminal responsibility for violating a federal gun law. Defendant does not explain how any such order by a local officer passing by in a car takes precedence over a federal law prohibiting defendant, an alien illegally and unlawfully in this country, from possessing a firearm. Defendant offers no legal basis for such an argument.

19

Second, defendant would have to *prove* his claim that he received a lawful police order to arm himself even though he knew he was an alien illegally and unlawfully in this country, and that he then armed himself in response to this police order. Defendant cannot resolve this factual dispute on a motion to dismiss and likely has foreclosed a favorable resolution even in an evidentiary hearing.[5] For these reasons, defendant's argument that he cannot be charged for acting pursuant to a police order fails.

## CONCLUSION

WHEREFORE, the government respectfully requests that this Court enter an order denying defendant's motion to dismiss.[6]

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By: /s/ *Sheri H. Mecklenburg*
SHERI H. MECKLENBURG
Assistant U.S. Attorney
219 South Dearborn St., Rm. 500
Chicago, Illinois 60604
(312) 469-6030

Dated: January 21, 2022

---

[5] Even aside from all the other factual disputes surrounding defendant's story about the purported police "order," defendant, as noted above, admits that he did not arm himself in obeyance of a police order, given that he already possessed the gun for some time *before* he received the purported police order. Defendant's Renewed Motion, ¶¶15,17.

[6] In its motion for an extension of time filed on December 9, 2021, the government also requested an order for defendant to redact all PII contained in the motion to dismiss, supporting memorandum and exhibits. No such order issued, and defense counsel did not voluntarily comply with his obligation to redact all PII. The government requests that such an order be entered, and that defense counsel comply immediately.