IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA
Plaintiff,

Case No. 20CR613

v.

Heriberto Carbajal-Flores,
Defendant.

## MOTION TO DISMISS INDICTMENT UNDER THE SECOND AMENDMENT

**I.     Introduction**

In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), the Supreme Court rewrote the test for determining whether a firearm law violates the Second Amendment. Previously, courts of appeals had determined whether such a law is constitutional by applying a two-step test. Under the first step, courts determined whether the law was consistent with analogous gun restrictions from the Nation's founding and early history. If it was, the law passed constitutional muster. But if it was not, the law could still survive if the government's interest in the restriction outweighed the infringement on the individual.

*Bruen* got rid of the second step. It held that "a constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all." *Bruen*, 142 S. Ct. at 2129 (quotations omitted). So for a law to survive a Second Amendment challenge, the government must still "identify an American tradition" justifying the law's existence under the first step. But if it cannot, courts may no longer apply a "means-end scrutiny" to uphold the law under the second step. *Id*. at 2125, 2138. Instead, the inquiry ends, and the law is

1

unconstitutional.

*Bruen* abrogated over a decade of precedent rejecting Second Amendment challenges. One of these challenges involves the statute charged in this indictment, 18 U.S.C. § 922(g)(5), which prohibits an alien illegally or unlawfully in the United States from possessing a firearm. Here, as in *Bruen*, the government cannot meet its burden to show a historical tradition of restricting non-citizens 'illegally or unlawfully' in the United States from possessing firearms. From 17th-century England through Reconstruction, there is no historical analogue of disarming whole swaths of the populace simply because they had attained legal immigration status. To the contrary, early Americans used targeted regulations to prevent dangerous people from committing crimes with guns. (And even people feared to be dangerous generally could still keep firearms for self-defense.) In some instances, state courts and Congress recognized that permanent disarmament—even of those who committed treason—was incompatible with the traditional right to bear arms.

Going forward, *Bruen* provides the only relevant test for determining whether a gun law is constitutional. And because a firearms regulation can no longer be upheld under a "means-end scrutiny," the inquiry ends. Thus, § 922(g)(5) is unconstitutional, and the Court should dismiss the indictment.

**II.    Statement of Facts**

The facts of this case have been outlined in Defendant's previous motion *(See Dkt 43* at 1-7) and do not need repeating in detail. Suffice to say, Defendant is alleging he grew up in the Little Village neighborhood (*Id*. at 1-2) , that he received the handgun in question on the evening of June 1, 2020 in the midst of a wave of chaos in the city (*Id*. at 4), and that he received the handgun with the purposes of personal protection and protection of the neighborhood tire store (*Id.*).

**III.    Argument**

The Second Amendment states that "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. That codified people's pre-existing right to defend themselves from dangers inherent to living among others. *Bruen*, 142 S. Ct. at 2128, 2135. *Bruen* compels the conclusion that § 922(g)(5) impermissibly infringes upon that right.

First, *Bruen* laid out a new framework to test any restrictions on one's right to bear arms. That framework abrogates the Seventh Circuit's means-end test for firearm regulations, *see infra* Section III.A, and assumptions that certain types of regulations are constitutional. Second, *Bruen* shows that § 922(g)(5) presumptively violates the Second Amendment because Mr. Carbajal-Flores's conduct triggers the Amendment's plain text. *Infra* Section III.B. And finally, a review of the historical record shows that the government cannot meet its burden to show that § 922(g)(5) complies with the Nation's tradition of firearm regulation. *Infra* Section III.C. Thus, the indictment must be dismissed.

### A. *Bruen* adopted a new approach to the Second Amendment, overruling contrary Seventh Circuit precedent.

The Seventh Circuit had been following the 'means-end' two step approach that was abrogated in Bruen. *See Meza-Rodriguez*, 798 F.3d 664, 666 (7th Cir. 2015) ("In addressing § 922(g), we have concluded that "some form of strong showing," akin to intermediate scrutiny, is the right approach.")[1] And the Seventh Circuit regularly applies means-end scrutiny in the context of analyzing firearm

---

[1] And this Court acknowledged the intermediate scrutiny approach in denying the previous motion to dismiss (*See Dkt 57* at 3)- "when ruling in *Meza Rodriguez*, the Court applied intermediate scrutiny and determined that § 922(g)(5) permissibly restricted Meza-Rodriguez's Second Amendment rights because the government possesses a sufficiently strong interest in prohibiting persons who are difficult to track and who have an interest in eluding law-enforcement from possessing guns. *Meza-Rodriguez* at 673." (internal quotations omitted).

3

regulations. ²  As stated in Bruen, the Courts of Appeals have coalesced around a "two-step" framework for analyzing Second Amendment challenges that combines history with means-end scrutiny. *Bruen*, 142 S. Ct. at 2125.

Under the first step, courts determined whether the law was consistent with analogous gun restrictions from the Nation's founding and early history. If the law was not consistent with gun restrictions from the Nation's founding and early history, Judges moved to the second step of applying a form of means-end scrutiny to see if the law could be justified on public safety grounds and survive a constitutional attack. This could vary between intermediate and strict scrutiny, but required more than a rational basis. *Heller*, 554 U.S. at 628 n. 27. So at a minimum, courts always assigned *some* weight to the government's interest in public safety and keeping firearms away from those most likely to misuse them.

But in a watershed opinion, the Supreme Court held that this second step was "one step too many" because only constitutional text and history can justify a firearms regulation. *Bruen*, 142 S. Ct. at 2127. In *Bruen*, the Supreme Court analyzed whether a New York law allowing state authorities to deny gun licenses for lack of "proper cause" violated the applicants' Second Amendment rights. *Id*. at 2123. Under the law's "demanding" standard, state officials had broad discretion to withhold a license unless the individual could "demonstrate a special need for self-protection distinguishable from that of the general community." *Id*. (quotations omitted). *Bruen* observed that at least seven jurisdictions have such "'may issue' licensing laws," under which authorities regularly deny concealed-carry licenses

---

² *See United States v. Skoien*, 614 F.3d 638, 641-42 (7th Cir. 2010) (en banc) (avoiding the "'levels of scrutiny' quagmire" but noting that § 922(g)(9) serves an important governmental objective and that this provision has a substantial relation with this objective); *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010) (applying intermediate scrutiny to § 922(g)(1)); *United States v. Yancey*, 621 F.3d 681, 683 (7th Cir. 2010) (requiring "a strong showing that the challenged subsection of § 922(g) [i]s substantially related to an important governmental objective").

4

"even when the applicant satisfies the statutory criteria." *Id*. at 2124. *Bruen* then considered whether such laws violate the Second Amendment.

*Bruen* began by affirming the first step: that courts examine "a variety of legal and other sources to determine *the public understanding* of a legal text in the period after its enactment or ratification." *Id*. at 2127–28 (quotations omitted). This methodology "center[s] on constitutional text and history." *Id*. at 2128–29. Initially, the court must determine whether the individual's conduct falls within "the Second Amendment's plain text." *Id*. at 2126. If it does, then the conduct is "presumptively" constitutional and "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id*. at 2130, 2126. This inquiry requires an examination of the nation's "well-defined restrictions governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms." *Id*. at 2138.

But *Bruen* then declined to conduct the second step, stating that the Court's prior decision in *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008), did not support "applying means-end scrutiny in the Second Amendment context." *Id.* at 2127. The Court explained that "[t]he Second Amendment is the very product of an interest balancing by the people" and thus "demands our unqualified deference." *Id*. at 2131 (quotations and emphasis omitted). So even if a firearm restriction *could* satisfy an "interest-balancing inquiry," the "very enumeration of the right takes [it] out of the hands of government." *Id*. at 2129 (quotations omitted). Thus, the "second step is inconsistent with *Heller*'s historical approach and its rejection of means-end scrutiny." *Id*. at 2129.

Having dismissed the second step, *Bruen* provided guidance on conducting the first-step historical analysis. The Court considered "whether 'historical precedent' from before, during, and even after the founding evinces a comparable

5

tradition of regulation." *Id*. But *Bruen* reminded that "not all history is created equal." *Id*. at 2131–32. That is because "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Id*. at 2136 (quotations omitted). Because the Second Amendment was adopted in 1791, earlier historical evidence "may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years." *Id*. Similarly, post-ratification laws that "are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id*. at 2137 (quotations and emphasis omitted).

And the burden falls squarely on the government to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id*. at 2127. If the government cannot do so, the infringement cannot survive.

Employing these tools, *Bruen* concluded that New York's law implicated a societal problem dating back to the founding: "handgun violence, primarily in urban areas." *Id*. at 2131 (simplified). Thus, the government bore the burden to show a "comparable tradition of regulation" from the founding era. *See id*. The government, however, had not "demonstrate[d] a tradition of broadly prohibiting the public carry of commonly used firearms for self-defense." *Id*. at 2138. At most, the government had shown restrictions on some "dangerous and unusual weapons" and "bearing arms to terrorize the people." *Id*. at 2143. Thus, "no historical basis" contradicted "an otherwise enduring American tradition permitting public carry." *Id*. at 2145, 2154.

As *Bruen* summarized, the "standard for applying the Second Amendment" now requires courts to do the following:

- If the Second Amendment's "plain text" covers an individual's conduct, courts must presume the Constitution "protects that conduct";

6

- To rebut this, the government must show that any restriction is "consistent with the Nation's historical tradition of firearm regulation";

- If the government cannot do so, the law is unconstitutional.

*Id*. at 2129–30 (quotations omitted). Accordingly, *Bruen* requires courts to revisit any Second Amendment decision not consistent with this methodology.

### B. The Second Amendment's plain text covers Mr. Carbajal-Flores's conduct.

Mr. Carbajal-Flores's conduct is presumptively lawful because it falls within the Second Amendment's plain text. At the outset, Mr. Carbajal-Flores is "part of 'the people' whom the Second Amendment protects." *Bruen*, 142 S. Ct. at 2134 (quoting *Heller*, 554 U.S. at 580). "[T]he people" protected by the Second Amendment "unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580.

Comparison to other constitutional amendments confirms this view. As *Heller* explained, "the people" is a "term of art employed in select parts of the Constitution," including "the Fourth Amendment, . . . the First and Second Amendments, and . . . the Ninth and Tenth Amendments." *Id.* (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). And as discussed in *Meza-Rodriguez*, "we see no principled way to carve out the Second Amendment and say that the unauthorized (or maybe all noncitizens) are excluded." *Meza-Rodriguez,* 798 F. 3d at 672.

Additionally, the Second Amendment's plain text protects Mr. Carbajal-Flores's "proposed course of conduct," *Bruen*, 142 S. Ct. at 2134, that is, "to possess and carry weapons in case of confrontation.'" *Id.* at 2135 (quoting *Heller*, 554 U.S. at 592); *contra* 18 U.S.C. § 922(g). Thus, his possession of a firearm for self-defense is "presumptively guarantee[d]," unless the government

7

meets its burden to prove that § 922(g)(5) "is consistent with this Nation's historical tradition of firearm regulation." *Id.*

### C. The government cannot show "an American tradition" that individuals 'illegally or unlawfully' may not possess a gun

The government cannot meet its burden to establish the requisite historical tradition. As in *Bruen*, the "general societal problem" that § 922(g)(5) is designed to address—i.e., people who had not not regulated their immgration status with access to guns—is one "that has persisted since the 18th century." *Id.* at 2131. Thus, § 922(g)(5) is unconstitutional unless the government shows a robust tradition of "distinctly similar historical regulation." *Id.* The government cannot meet its burden to establish § 922(g)(5)'s historical pedigree for a simple reason: the federal government did not have laws restricting entry into the country until the late 19th Century.[3] The law § 922(g)(5) was adopted *177 years* after the Second Amendment—far too recently to alter its meaning. *Bruen*, 142 S. Ct. at 2154 n.28 ("[L]ate-19th-century evidence" . . . does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence.").

Section 922(g)(5) very much contradicts earlier evidence from the relevant historical periods: "(1) . . . early modern England; (2) the American Colonies and the early Republic; (3) antebellum America; [and] (4) Reconstruction." *Id.* at 2135–36. Those periods lack evidence of any analogue to § 922(g)(5).

The government will argue that, historically, *some* jurisdictions *sometimes* regulated firearm use by those considered *presently* violent. But that is not a "distinctly similar historical regulation," *Bruen*, 142 S. Ct. at 2131, for at least

---

[3] *See* "The Imaginary Immigration Clause, 120 Mich. L. Rev. 1419, 1423 (2022) (Describing Chinese Exclusion Act of 1882 as the "first federal immgration restrictions"); *See also* https://www.history.com/news/the-birth-of-illegal-immigration (last visited Aug 15, 2022) ("there were no federal laws governing who could enter and who couldn't until the Chinese Exclusion Act of 1882")

8

three reasons. First, there is no correlation between people with immigration status and being presently violent. Second, the historical regulations required an individualized assessment of a person's threat to society. And finally, the historical regulations almost always allowed people deemed violent to still possess weapons for self-defense. Thus, even those convicted of serious crimes—including rebellion—remained entitled to protect themselves in a dangerous world, with firearms if necessary. Those laws' targeted nature makes them a far cry from declaring that any person, who has not regulated their immigration status, can *never* possess "the most popular weapon chosen by Americans for self-defense in the home." *Heller*, 554 U.S. at 629.[4]

### 1. Forever depriving all immigrants who have not yet regulated their immigration status to bear arms does not comport with colonial and Founding-era history.

Because laws disarming anyone who had not regulated their immigration status did not appear until 1968, they cannot shed light on this Nation's history and tradition of firearm regulation. The Court spoke without qualification: "20th-century evidence . . . does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen*, 142 S. Ct. at 2154 n.28. And Congress did not pass § 922(g)'s precursor until 1938. Federal Firearms Act (FFA), ch. 850, § 2(e), 52 Stat. 1250, 1251. And even that law was a far cry from § 922(g)(5). It merely criminalized *receiving* a firearm *in interstate commerce* by those convicted of a "crime of violence," which meant "murder, manslaughter, rape, mayhem, kidnapping, burglary, housebreaking," or various forms of aggravated assault. *Id.* §§ 1(6), (2)(e), 52 Stat. at 1250–51. Congress did

---

[4] And to the extent that such restrictions create ambiguity, ambiguity is insufficient for the government to meet its burden. *Bruen*, 142 S. Ct. at 2139, 2141 n.11.

not extend its proscription to those who had not regulated their immigration status until 30 years later and 177 years after the ratification of the Second Amendment in 1791.

Moreover, Congress passed a naturalization law in 1790 giving citizenship to those who had resided in the United States for two years. *See H. R. 40, Naturalization Bill*, March 4, 1790. Notwithstanding that citizenship process, the founders decided to use the term 'people' and not 'citizens' when ratifying the second amendment the following year. There is no history and tradition in this country of disarming those who had not yet regulated their immigration status.

### D. This Court should dismiss or, at minimum, hold an evidentiary hearing.

Here, the indictment charges Mr. Carbajal-Flores as being an alien "illegally or unlawfully" who "possess[ed] a firearm" under 18 U.S.C. § 922(g)(5). *See* Dkt. No. 1 But because the government cannot "meet [its] burden to identify an American tradition" that prohibited people "illegally or unlawfully" from possessing firearms, § 922(g)(5) "is therefore unconstitutional." *Bruen*, 142 S. Ct. at 2138. At a minimum, the government must present evidence of a historical tradition that would have prohibited a person in Mr. Carbajal-Flores's circumstances from possessing a firearm. If it cannot, the Court must dismiss the indictment.

## IV. Conclusion

For these reasons, the Court should dismiss the indictment or, at a minimum, hold an evidentiary hearing.

Respectfully submitted,

_____

10

Dated:  August 15, 2022    *s/ Jacob S. Briskman*
Jacob S. Briskman, Attorney-at-Law, P.C.
Attorneys for Defendant
2054 N. California Ave.
Chicago, IL 60647
Ph-   312-945-6207
Fax- 773-442-2117
Email:  jacob.briskman@gmail.com