IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA
     Plaintiff,

                              Case No. 20CR613

v.

Heriberto Carbajal-Flores,
     Defendant.

---

**DEFENDANT'S RENEWED SECOND MOTION TO DISMISS INDICTMENT UNDER THE SECOND AMENDMENT OF THE U.S. CONSTITUTION**

### I.   Introduction

NOW COMES, Defendant, Heriberto Carbajal-Flores (hereinafter, "Mr. Carbajal-Flores"), with his *Renewed Second Motion to Dismiss Indictment Under the Second Amendment of the U.S. Constitution*. The Government seeks to charge Mr. Carbajal-Flores with possession of a firearm in violation of 18 U.S.C. § 922(g)(5)(A). Mr. Carbajal-Flores moves to dismiss the underlying charge in this matter on the basis of newly decided case law. Specifically, the Third Circuit Court of Appeals' recent decision in *Range v. Attorney General United States*, 2023 U.S. App. LEXIS 13972 \* (3d Cir. 2023), and the Seventh Circuit's decision in *Patrick Atkinson v. Merrick B. Garland*, 70 F.4th 1018 (7th Cir. 2023), provides further guidance on how to analyze and implement the recent United States Supreme Court decision in *New York State Rifle & Pistol Association, Inc., et al. v. Bruen, Superintendent of New York State Police, et al.*, 142 S. Ct. 2111 (2022). Accordingly, Mr. Carbajal-Flores argues that such additional analysis further supports Defendant's prior arguments that 18 U.S.C. § 922(g)(5)(A) is in fact unconstitutional on its face, and as it applies

1

to him and his circumstances. And as such, Mr. Carbajal-Flores should be afforded his Second Amendment rights, and the charge against him under section 922(g)(5)(A) be dropped.

Following the 2022 decision by the United States Supreme Court in *Bruen*, a large number of challenges were, and continue to be, filed throughout the country by petitioners and defendants alike in hopes of ensuring their long-awaited rights under the United States' Constitution's Second Amendment's right to bear arms. *See* Matt Valentine, *Clarence Thomas Created a Confusing New Rule That's Gutting Gun Laws*, Politico Magazine (July 28, 2023)[1] ("Thirty percent of civil cases and nearly 4 percent of criminal cases that have cited *Bruen* have resulted in the invalidation of gun control provisions, among 284 total decisions addressing Second Amendment claims."). While the decisions in *Range* and *Atkinson* further add to this landscape, these decisions nevertheless reaffirm the high burden that has been placed on the government post-*Bruen*, requiring it to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127.

In *Range*, for example, the petitioner pleaded guilty in 1995 for making false statements about his income in order to obtain $2,458 in food stamp assistance. *Range*, 2023 U.S. App. LEXIS 13972 at *2-*3. Range's conviction was classified as a misdemeanor and he served three years of probation. *Id.* Regardless, because the charge was ultimately punishable by up to five years in prison, Range found himself denied his Constitutional right to bear arms under the Second Amendment. *Id.*

---

[1] https://www.politico.com/news/magazine/2023/07/28/bruen-supreme-court-rahimi-00108285.

Specifically, 18 U.S.C. § 922(g)(1) prohibited his ownership of a firearm because he had previously been convicted "of a crime punishable by imprisonment for a term exceeding one year," which is the federal definition of a felony. *Id*. Filing suit in the Eastern District of Pennsylvania, Range sought to have §922(g)(1) declared unconstitutional in violation of the Second Amendment as it applied to him specifically. *Id*. at *4. After one pre-*Bruen* analysis and circuit court affirmation, a petition for rehearing en banc brought before the Third Circuit Court the following federal question: "whether the federal felon-in-possession law, 18 U.S.C. §922(g)(1), violates the Second Amendment as applied to Range." *Id*. at *6. The Third Circuit took up the burden of analyzing exactly "*who* is among 'the people' protected by the Second Amendment." *Id*. at *8 ("Range claims he is one of 'the people' entitled to keep and bear arms and that our Nation has no historical tradition of disarming people like him. The Government responds that Range has not been one of 'the people' since 1995, when he pleaded guilty in [ ] state court to making a false statement on his food stamp application, and that his disarmament is historically supported."). *But see Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring) ("Our holding decides nothing about who may lawfully possess a firearm . . ..."). Ultimately, in a narrow decision, the Third Circuit determined that Range was correct. Despite his prior conviction, Range in fact "remains among 'the people' protected by the Second Amendment," as the government had failed to show "that our Nation's history and tradition of firearm regulation support disarming Range." *Range*, 2023 U.S. App. LEXIS 13972 at *20.

3

Similarly, in *Atkinson*, the Seventh Circuit found itself contemplating the constitutionality of the same federal statute, 18 U.S.C. §922 (g)(1). *See generally*, *Atkinson*, 70 F.4th 1018 (7th Cir. 2023). In this case, the plaintiff had pled guilty to a felony mail fraud charge in 1998 but, aside from that, had a clean record for more than 24 years. Subsequently, he was denied the right to purchase a gun under section 922(g)(1) for having been convicted of "a crime punishable by imprisonment for a term exceeding one year," just like in *Range*. *See* 18 U.S.C. § 922(g)(1). The plaintiff then filed a lawsuit under 18 U.S.C. § 925A seeking to challenge whether section 922(g)(1) was constitutional as it applied to him, just like *Range*. *Atkinson*, 70 F.4th at 1022. In the district court, using the pre-*Bruen* framework, the court granted the government's motion to dismiss. *Id*. However, the Seventh Circuit opted to remand the case back to the court below in order to review the case following the newly decided *Bruen* analysis. *Id*. at 1024. Instructive to the lower court's analysis, the Seventh Circuit noted the large undertaking in a *Bruen* analysis, stating:

> We recognize that asking these questions is easier than answering them. As our dissenting colleague likewise emphasizes, the historical analysis required by *Bruen* will be difficult and no doubt yield some measure of indeterminacy. The parties may be unable altogether to find answers to certain questions, may find incomplete information in response to others, and perhaps in some instances may identify substantial historical information pertinent to one or another dimension of the required inquiry. In the end, the district court (and surely us too, when this case or another one like it returns) will have to give the best answer available to whether the government has carried its burden of "affirmatively prov[ing] that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."

*Id*. (citing *Bruen*, 142 S. Ct. at 2127).

4

The *Bruen* Court itself noted that, for certain cases, "that inquiry will be fairly straightforward. For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2131. It would be inconsistent with *Bruen* and the other circuit courts, should this Court not require the Government offer a more complete analysis that shows that Mr. Carbajal-Flores is in fact an individual, within the physical bounds of the United States, that should have his Second Amendment rights restricted. Because the Government has not and cannot make that more complete analysis, the charges against Mr. Carbajal-Flores should be dismissed as unconstitutional.

## II.   Statement of Facts

Mr. Carbajal-Flores is a DREAMer.[2] Having fled the abuse of Mr. Carbajal-Flores' father in hopes of a fresh start in the United States in 2002, Mr. Carbajal-Flores' mother took the ten-year-old boy and began anew, specifically laying down roots in the Chicago area for most of their lives. In fact, for over twenty years, Mr. Carbajal-Flores has lived, worked, and attended school in Chicago. Now, Mr. Carbajal-Flores is married to a United States citizen and has children who are United States citizens. He has applied for, and possesses, a valid Illinois driver's license. And the federal government has granted him employment authorization. Culturally and socially, he is an American.

---

[2] "DREAMer" is the nomenclature used to refer to someone brought to the United States by their parents when they were a child who could have benefitted from the Development, Relief and Education for Alien Minors (DREAM) Act.

Mr. Carbajal-Flores is a member to his neighborhood community in that he aids the neighborhood watch–which is exactly what he was doing on Saturday, June 20, 2020, when riots and chaos consumed the Chicago streets during a now-infamously dangerous Father's Day weekend.[3] Despite an unrealistic hope of an enjoyable Father's Day weekend with his family, Mr. Carbajal-Flores took up his heavy duty as a husband, father and neighbor and attempted to defend himself and those around him from unnecessary harm and danger during that perilous time. A brief review of the newspaper articles from that particular weekend alone prove, beyond a shadow of doubt, the lawlessness that had engulfed the city of Chicago. Mr. Carbajal-Flores acted reasonably and should be afforded the same rights to self defense as anyone else that found themselves in the midst of the riots.

## III. 18 U.S.C. § 922(g)(5) is Unconstitutional on Its Face.

The Government cannot meet the high burden placed on it following the *Bruen* decision. Specifically, the Government cannot "affirmatively prove that its firearms regulation [18 U.S.C. § 922(g)(5)] is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen,* 142 S. Ct. at 2127. In fact, history itself shows the exact opposite.

---

[3] *See* Annie Sweeney & Jeremy Gorner, *Chicago's violent weekend renews search for answers in a tense city, points again to entrenched problems*, The Chicago Tribune, June 23, 2020, https://www.chicagotribune.com/news/criminal-justice/ct-chicago-weekend-violence-analysis-20200623-bucz3ynr3rcazemol4663fhtqy-story.html; *Chicago Violence: 104 Shot, 14 Fatally, in Deadly Father's Day Weekend Across the City*, NBC Chicago, June 20, 2020, https://www.nbcchicago.com/news/local/chicago-weekend-shootings-2-dead-at-least-21-wounded-in-gun-violence-thus-far/2292837/; *see also* Neil MacFarquhar & Robert Chiarito, *Chicago Gun Violence Spikes and Increasingly Finds the Youngest Victims*, The New York Times, Pub. July 5, 2020, Updated July 22, 2020, https://www.nytimes.com/2020/07/05/us/chicago-shootings.html ("Nine children under the age of 18 have been shot dead in Chicago since June 20.").

In order to comply with the Second Amendment, the first issue that needs to be considered is whether 18 U.S.C. § 922(g)(5) targets a longstanding problem in the country. "To be compatible with the Second Amendment, regulations targeting longstanding problems must be 'distinctly similar' to a historical analog." *Range*, 2023 U.S. App. LEXIS 13972 at *20. Applying this rule to the case at hand, consideration of past regulations, or lack thereof, prove that lifetime disarmament of an individual based on alienage or nationality alone does not have roots in the history and tradition of the United States. In fact, such a regulation brought before the creators of the Second Amendment would very likely find our founders stumped as to its effect on a growing country that has consistently welcomed many from beyond the American shores from the beginning on.

"To defend 'modern regulations that were unimaginable at the founding,' the government may reason by analogy. That does not require pinpointing a 'dead ringer'–a 'well-established and representative historical *analogue*' will do. The proper inquiry, in short, turns on whether the 'modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified.'" *Atkinson*, 2023 U.S. App. LEXIS 15357 at *5 (citing *Bruen*, 142 S. Ct. at 2132-33 (original emphasis)). As it applies with section 922(g)(5), any comparative regulations must be "distinctly similar" as this is a longstanding issue. *See Range*, 2023 U.S. App. LEXIS 13972 at *14. As previously stated, people coming to the United States from other countries (i.e., having a

7

different alienage or nationality) has *always* been an issue of importance and will always continue to be of importance.

The Government has not satisfactorily pointed to a distinctly similar regulation disarming people solely based on their alienage or nationality. In this case, the Government has presented examples which may evidence a tradition of banning some groups' possession, but that is not the question. "That Founding-era governments disarmed groups they distrusted like Loyalists, Native Americans, Quakers, Catholics, and Blacks does nothing to prove that [Mr. Carbajal-Flores] is part of a similar group today. And any such analogy would be 'far too broad[ ].' *See Bruen*, 142 S. Ct. at 2134 (noting that historical restrictions on firearms in 'sensitive places' do not empower legislatures to designate any place 'sensitive' and then ban firearms there)." *Range*, 2023 U.S. App. LEXIS 13972 at *16. For instance, "Pre-Revolutionary War gun regulations did not necessarily depend on categories of legal citizenship, but rather on a conception of membership in the national community contingent upon race, wealth, and gender." Pratheepan Gulasekaram, ARTICLE: "THE PEOPLE" OF THE SECOND AMENDMENT: CITIZENSHIP AND THE RIGHT TO BEAR ARMS, 85 N.Y.U.L. Rev. 1521, 1542-43 (2010). For instance, "militia membership and its attendant firearms rights and obligations were not extended to include poor whites until the first decades of the nineteenth century." *Id*. In the past, white majorities would tend to use gun regulations as a political weapon bent on keeping firearms out of the hands of certain unfavorable political groups that it had determined to be of danger. *Id*.

8

As it applies to firearms regulations based on alienage, the history is spotty, at best. Alienage-based firearms regulations only became prevalent in the early to mid-twentieth century. *See* Patrick J. Charles, ARTICLE: THE FUGAZI SECOND AMENDMENT BRUEN'S TEXT, HISTORY, AND TRADITION PROBLEM AND HOW TO FIX IT, 71 Clev. St. L. Rev. 623, 682 (2023). However, very notably, these regulations were not widespread in the statute and ordinance books of the United States. *Id.* (see footnote 388) (Between 1922 and 1930, "the first prevalent firearms restrictions based on alienage were part of the Capper Bill and later the Uniform Firearms Act."). To understand the history of firearm regulations based on alienage makes the clear and plain language of the Second Amendment that much clearer. The "right to 'keep and bear arms' belongs to 'the people,' not just citizens, unless government defendants are allowed to play loose with history[,] that is[,] rely on the history of federal, state, and local immigration and alienage powers[,] then all firearms regulations based on alienage must be nullified and ruled unconstitutional." *Id.*; *see United States v. Jimenez-Shilon*, 34 F.4th 1042, 1049 (11th Cir. 2022) (regarding reliance on the history of federal, state and local immigration and alienage laws)).

In *United States v. Jimenez-Shilon*, the *pre-Bruen* Eleventh Circuit panel concluded the lower court was not applying the correct burden, but the panel was mistakenly relying on the government's immigration and alienage powers to appropriately define the scope of the Second Amendment. Quoting *District of Columbia v. Heller*, the *Jimenez-Shilon* court even considered English law that

predated America's founding, noting that even the predecessor law to the United States' Second Amendment was not "available to the whole population." 554 U.S. 570, 595 (2008). Then, following the founding of our own country, many were not considered "citizens," and therefore not afforded such rights, including women, native americans, and slaves, among many others. *See Jimenez-Shilon*, 34 F.4th at 1047 (quoting Joyce Lee Malcolm, *To Keep and Bear Arms: The Origin of an Anglo-American Right*, 140 (1994) ("The English view carried across the Atlantic, where it was well understood that the right to bear arms 'did not extend to all New World residents.'")). These such groups, however, are not distinctly similar to this case, because they do not show that a regulation has sought to disarm a whole group of people solely based on alienage or nationality. The concurring opinion in *Range* is instructive, as the court noted it was no longer persuasive to analogize to previous laws restricting ownership based on race or religion: "[t]oday, we emphatically reject these bigoted and unconstitutional laws, as well as their premise that one's race or religion correlates with disrespect for the law." *Range*, 2023 U.S. App. LEXIS 13972 at *fn 50.

History again backs up a basic reading of the plain language of the Second Amendment. The right to bear arms is a right of the "people" of this country, not just its formal citizens, and the government does not have the power to permanently disarm entire swaths of the population solely based on their alienage or nationality.

**IV.    18 U.S.C.S. § 922(g)(5) is Unconstitutional as Applied to Mr. Carbajal-Flores.**

Alternatively, in order to preclude Mr. Carbajal-Flores from his Constitutional rights under the Second Amendment, the Government must show that 18 U.S.C.S. § 922(g)(5), as it applies to Mr. Carbajal-Flores specifically, is part of a "historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127. An "as-applied challenge" to section 922(g)(5) "is one that charges an act is unconstitutional as applied to [the challenger's] specific activities even though it may be capable of valid application to others." *Surita v. Hyde*, 665 F.3d 860, 875 (7th Cir. 2011) (citing *Members of City Council v. Taxpayers for Vincent*, 104 S. Ct. 2118 (1984)).

The test used to conduct an as-applied challenge to a regulation is substantially different than that of a facial challenge. Notably, a facial challenge to a particular law is much more difficult to bring successfully than that of an as-applied challenge. *See United States v. Salerno*, 107 S. Ct. 2095 (1987). In order to succeed on a facial challenge to a law, the challenger must establish "that no set of circumstances exist under which [the law] would be valid" or, alternatively, that the statute lacks any "plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 472 (2010) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987) and *Washington v. Glucksberg*, 521 U.S. 702, 740, n.7 (1997) (Stevens, J., concurring in judgments) (internal quotation marks omitted)). On the other hand, an as-applied challenge "is one that charges an act is unconstitutional as applied to [the challenger's] specific activities even though it may be capable of valid application to

11

others." *Surita v. Hyde*, 665 F.3d 860, 875 (7th Cir. 2011) (citing *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 803 (1984)). This analysis requires a look very personal look at the petitioner. *See generally Range*, 2023 U.S. App. LEXIS at 13972. Despite these varying standards, facial and as-applied challenges can overlap conceptually. *See John Doe No. 1 v. Reed*, 561 U.S. 186 (2010) (describing a First Amendment challenge with elements of both types); *see also Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 475 (7th Cir. 2012). Nevertheless, the Government cannot meet their burden to show there is a history and tradition of permanently disarming people who have been in the United States since they were children based. Further, the Government cannot show that the provision should apply specifically to Mr. Carbajal-Flores: a resident of this country, and the Chicago area, for over 20 years, who went to school here, married a United States citizen here, and had children that he has raised here. He is not a flight risk, nor has he hid himself from authorities, even registering and obtaining a valid drivers' license and employment authorization. Even if this Court were to determine that section 922(g)(5) was not unconstitutional on its face, it is nevertheless unconstitutional as it applies to Mr. Carbajal-Flores, a hard-working individual that is part of the backbone of what makes this country great, and is proud to call himself an American.

As *Bruen* noted, "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Bruen*, 142 S. Ct. at 2136 (original emphasis) (quoting *Heller*, 554 U.S. at 634-35). In 1791, citizenship

included everyone who had lived here for two years and had pledged loyalty. H.R. 40, Naturalization Bill, March 4, 1790. Thus, to the extent the Second Amendment's use of the 'people' incorporates a citizenship component, it is citizenship as understood when the Amendment was passed–i.e., those who have lived here for two years and have pledged loyalty. Accordingly, this would include Mr. Carbajal-Flores, a long-term member of the Chicago, and American, community. Much like the petitioners in *Range* and *Atkinson* did, Mr. Carbajal-Flores can set himself apart from any type of group of people who may be stripped of their Second Amendment rights.

V.     **Conclusion**

For the foregoing reasons, Mr. Carbajal-Flores respectfully requests that this honorable Court grant his Renewed Second Motion to Dismiss Indictment Under the Second Amendment of the U.S. Constitution; dismiss the underlying charge against him for reason of 18 U.S.C. § 922(g)(5)(A) being unconstitutional as it applies to him; and reinstate Mr. Carbajal-Flores' Second Amendment Constitutional right to bear arms. The Government has failed to show a history or tradition of an absolute ban on individuals based on alienage or nationality alone and, further, it has failed to prove such a regulation can apply to Mr. Carbajal-Flores.

DATED: August 11, 2023

Respectfully Submitted,

*/s/ Jacob Briskman*

Jacob Briskman
Jacob S. Briskman, Attorney-At-Law
2054 N. California Avenue
Chicago, IL 60647
Tel: (312) 945-6207
jacob.briskman@gmail.com
Counsel for Defendant

## CERTIFICATE OF ELECTRONIC SERVICE

 The undersigned hereby certifies that he is an attorney of record for the Defendant and registered to file in the ECF system and that on August 11, 2023, he served an electronic copy of the above and foregoing **Motion**  by electronic service (ECF) to the Assistant United States Attorney assigned on this case who is registered on ECF in this case to receive EService of all documents.

/s/Jacob S. Briskman
Jacob S. Briskman
Attorney-at-Law
2054 N. California Ave.
Chicago, IL 60647
Ph- (312) 945-6207
Fax- (773) 442-2117
jacob.briskman@gmail.com

14