**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN  DISTRICT OF ILLINOIS**
**EASTERN DIVISON**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 20-CR-613 |
| | ) | |
| HERIBERTO CARBAJAL-FLORES, | ) | Hon. Sharon Johnson Coleman |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S**
**RENEWED SECOND MOTION TO DISMISS INDICTMENT**

Defendant Heriberto Carbajal-Flores is charged in a one-count indictment with possessing a firearm while illegally or unlawfully present in the United States, in violation of Title 18, United States Code, § 922(g)(5)(A). Dkt. 1. This Court denied defendant's prior motion to dismiss that indictment which, in relevant part, alleged that § 922(g)(5) is unconstitutional under the Second Amendment, pursuant to *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022). Dkt. 74. Defendant's renewed motion, advancing the same argument, is without merit. He presents no new cases undermining the government's authority to prohibit unlawfully present individuals (like defendant) from possessing a firearm, and he ignores more recently decided cases reaching the same conclusion that this Court previously reached in denying defendant's prior constitutional challenge. This Court should deny defendant's instant motion.

## I. BACKGROUND

The government has detailed the facts underlying defendant's offense conduct in previous filings and has submitted to the Court relevant video footage from a Police Observation Device. *See, e.g.*, Dkt. 46, pp. 2-7; Dkt. 48 (video). In summary, on June 1, 2020, in Chicago's Little Village neighborhood, defendant possessed and brandished a firearm; fired seven shots from that firearm at passing vehicles; and tried to fire additional shots at passing cars, but the gun jammed. *Id*. In a *Mirandized* interview, defendant later admitted to law enforcement that he had no legal status in the United States and had never sought legal status because he "just lived [his] life." Dkt. 46, p. 7.

On September 10, 2020, the grand jury returned an indictment charging defendant with violating § 922(g)(5)(A). Dkt. 1. That statute prohibits any person who is illegally or unlawfully in the United States from "possess[ing] in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(g)(5).

Defendant first moved to dismiss the indictment on May 3, 2021, and amended that motion on May 25, 2021. Dkt. 28, 32. In that initial effort, defendant argued that he qualified for an as-applied exception to § 922(g)(5) under *District of Columbia v. Heller*, 554 U.S. 570 (2008). Dkt. 28, 32. Defendant withdrew his motion to engage in discussions with the government, but on November 26, 2021, defendant refiled it, again arguing for an as-applied exception to § 922(g)(5) and further arguing that the statute violated the Constitution's Commerce and Equal Protection Clauses. Dkt. 35, 43. On April 13, 2022, this Court denied defendant's motion to dismiss. Dkt. 57.

On August 15, 2022, defendant moved to dismiss the indictment again, this time arguing that § 922(g)(5) was unconstitutional under *Bruen*, 142 S. Ct. at 2111. Dkt. 64. The government

responded. Dkt. 68. On December 19, 2022, this Court denied defendant's motion. Dkt. 74. In so

doing, this Court held, consistent with *United States v. Meza-Rodriguez*, 798 F.3d 664 (7th Cir.

2015), that the text of the Second Amendment protects undocumented residents' right to bear arms.

Dkt. 74 at 3-5. At the same time, though, this Court concluded that § 922(g)(5) "survive[d] the

constitutional challenge" because the government was able to show that the statute was "consistent

with the Nation's historical tradition of firearm regulation." *Id*. at 5-6. Citing the Eleventh Circuit's

decision in *United States v. Jimenez-Shilon*, 34 F.4th 1042 (11th Cir. 2022), this Court explained:

> Though conducted pre-*Bruen*, the Eleventh Circuit's analysis is particularly
> instructive. The Eleventh Circuit found that, beginning with the "laws of England
> predating the Founding," the right to bear arms (as codified in the English
> Declaration of Rights) "was not 'made available to the whole population.'"
> Thereafter, "[t]he English view carried across the Atlantic, where it was well
> understood that the right to bear arms 'did not extend to all New World residents.'"
> For example, several colonies banned gun ownership by slaves, Native Americans,
> and those unwilling to take an oath of allegiance to the state. A number of early
> state constitutions also limited the right to keep and bear arms to "citizens."
>
> . . . Though the concept of citizenship has changed over time, the prior restrictions
> identified by the government must only be a "representative historical *analogue*,
> not a historical *twin*." . . . Therefore, the Court joins the Eleventh Circuit (and
> others) in concluding that the historical precedent from before, during, and after the
> founding shows a tradition of regulating noncitizens' right to keep and bear arms
> comparable to § 922(g)(5).

Dkt. 74 at 5-6 (internal citations omitted); *see also id*. at 6 (citing *United States v. Perez*, 6 F.4th

448, 462–63 (2d Cir. 2021) (Menashi, J., concurring) (quotation omitted) (detailing a history of

colonial America in which "alien men . . . did not have the right to bear arms"), and *United States

v. DaSilva*, No. 3:21-CR-267, 2022 WL 127242870, at *12 (M.D. Penn. Nov. 23, 2022) ("[A]

substantial historical and traditional basis from the pre-Founding Era and Founding Era exists

which provides well-established and representative historical analogues to § 922(g)(5) prohibiting

an illegal alien from possessing a firearm and ammunition.").

Eight months later, defendant brought a renewed motion to dismiss the indictment. Dkt. 83. In this most recent motion, defendant again claims that § 922(g)(5) is unconstitutional under the Second Amendment, both facially and on an as-applied basis. *See generally id.* Defendant's current motion should be denied.

## II.    ARGUMENT

### A.    Defendant Cannot Satisfy His Burden of Establishing That This Court Erred When Denying His Earlier Motion To Dismiss the Indictment.

Although defendant has styled his motion as a "renewed" motion to dismiss the indictment, the motion is, in effect, a motion for reconsideration of an issue already decided by this Court: whether § 922(g)(5) is constitutional under the Second Amendment.

A party in a criminal prosecution may move a court to reconsider a pretrial ruling based on a factual or legal error. *See United States v. Rollins*, 607 F.3d 500, 502-03 (7th Cir. 2010) (citing *United States v. Healy*, 376 U.S. 75, 77-80 (1964)) (holding that the common-law practice of motions to reconsider allows district judges to correct oversights and errors). But to prevail on a motion for reconsideration, a defendant "must meet a high standard." *See Canon U.S.A, Inc. v. Nippon Liner Sys., Ltd.*, No. 90 C 7350, 1992 WL 137406, at *2 (N.D. Ill. June 2, 1992). "Courts will rarely grant such motions because of their limited function"; "these motions are designed to correct manifest errors of law or fact or to present newly discovered evidence." *Id.* In general, reconsideration is appropriate when: "(1) the court has patently misunderstood a party; (2) the court has made a decision outside the adversarial issues presented to the court by the parties; (3) the court has made an error not of reasoning but of apprehension; (4) there has been a controlling or significant change in the law since the submission of the issue to the court; or (5) there has been a controlling or significant change in the facts since the submission of the issue to the court." *River*

*Vill. W. LLC v. Peoples Gas Light & Coke Co.*, 618 F. Supp. 2d 847, 850 (N.D. Ill. 2008) (citing *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990)).

Defendant cannot satisfy this standard. He does not allege that this Court previously misunderstood him, made a decision outside the adversarial issues presented by the parties, or made an error not of reasoning but of apprehension. He also does not allege that there has been a controlling or significant change in the facts since the submission of the issue to the court. Rather, he alleges that "newly decided case law" now calls for dismissal of his § 922(g)(5) charge. Dkt. 83 at 1. But neither of the two cases upon which defendant relies adversely affects this Court's earlier decision to uphold § 922(g)(5) as constitutional.

First, defendant cites the Third Circuit's en banc decision in *Range v. Garland*, 69 F.4th 96 (3d Cir. 2023). Dkt. 83 at 1, 2-3. *Range* is not binding authority on this Court. Even more significantly, *Range* did not address § 922(g)(5). Instead, *Range* held that § 922(g)(1)—which prohibits felons from possessing firearms—was unconstitutional on an as-applied basis to an individual with a disqualifying prior conviction for fraud committed nearly three decades earlier. 69 F.4th at 106 (holding that "the Government has not shown that our Republic has a longstanding history and tradition of depriving *people like Range* of their firearms") (emphasis added). *Range* emphasized that its "decision today is a narrow one," applying "only" to plaintiff Range, given his violation of a Pennsylvania misdemeanor statute criminalizing the making of a false statement to obtain food stamps. *Id.* Defendant does not explain how *Range*'s analysis of a different federal firearms statute, as applied to a different individual, constitutes a "controlling or significant change in the law" in the context of § 922(g)(5). *River Vill. W. LLC*, 618 F. Supp. 2d at 850.

To the contrary, federal courts have recognized that even where *Bruen* may render one federal firearms statute unconstitutional, *Bruen* does not necessarily render a different federal

firearms statute unconstitutional. For example, in March 2023, in *United States v. Rahimi*, the Fifth Circuit struck down 18 U.S.C. § 922(g)(8)—which makes it unlawful for an individual to possess a firearm if that individual is under a court order related to domestic violence—as unconstitutional under *Bruen*. 61 F.4th 443, 461 (5th Cir. 2023) (describing such a ban as an "outlier[] that our ancestors would never have accepted").[1] Less than six months later, the Fifth Circuit rejected an argument that its conclusion in *Rahimi* regarding the unconstitutionality of § 922(g)(8) also demonstrated the unconstitutionality of § 922(g)(1). The Fifth Circuit wrote: "[I]n fact, *Rahimi* suggests that *Bruen's* logic may not extend to this provision." *See United States v. Washington*, No. 22-10574, 2023 WL 5275013, at *1 (5th Cir. Aug. 16, 2023) (citing *Rahimi*, 61 F.4th at 451-52, and its observation that *Bruen* refers to "law-abiding" citizens in discussing the Second Amendment's scope). At bottom, the *Range* decision is not controlling on this Court, does not address the constitutionality of § 922(g)(1), and does not even necessarily bear on the distinct question of the constitutionality of § 922(g)(5).

Defendant's reliance on *Atkinson v. Garland*, 70 F.4th 1018 (7th Cir. 2023), is similarly unavailing. Dkt. 83 at 4-5. Like *Range*, *Atkinson* involved an as-applied challenge to § 922(g)(1)'s constitutionality brought in a civil matter by a plaintiff with a fraud conviction. 70 F.4th at 1018. *Atkinson* did not decide the constitutional question. Instead, because the district court in *Atkinson* dismissed a civil complaint before *Bruen* was decided—and, as a result, without applying *Bruen's* "text and history" test—the panel majority in *Atkinson* remanded the matter "to allow the district

---

[1] On June 30, 2023, the Supreme Court granted certiorari in *Rahimi. See* 2023 WL 4278450. It will hear oral argument in the matter on November 7, 2023.

court to undertake the *Bruen* analysis in the first instance." *Id.* at 1020. Put another way: *Atkinson* did not change the law regarding § 922(g)(1), let alone § 922(g)(5).[2]

Defendant suggests that *Atkinson* represents an intervening change in the law in a different respect—by requiring "a more complete analysis" than what the government previously provided to this Court in order to establish that a modern firearms regulation is consistent with historical traditions permitting categorical disarmament of individuals. Dkt. 83 at 4-5. But in advancing this claim, defendant ignores critical differences in the timeline in *Atkinson* and the timeline in this matter. As noted above, the district court in *Atkinson* dismissed the complaint without the benefit of *Bruen* and relying on pre-*Bruen* Seventh Circuit precedent barring near-identical challenges. *See Atkinson*, 70 F.4th at 1022; *Atkinson v. Garland*, 2022 WL 787934 (N.D. Ill. Mar. 15, 2022). Plaintiff Atkinson appealed and filed his Seventh Circuit brief approximately one month before *Bruen* was decided, *see* Brief for Appellant, Appeal No. 22-1557, 2022 WL 1670653, and the government filed its response brief about one month after *Bruen* was decided, *see* Brief for Appellees, Appeal No. 22-1557, 2022 WL 3007917. Given this timeline, the panel majority in *Atkinson* observed that the "parties' briefing on appeal only scratche[d] the surface of the historical analysis now required by *Bruen*." 70 F.4th at 1020; *see also id.* at 1022 ("The parties' briefing does not grapple with *Bruen*."). For that reason, the panel majority decided that "[t]he best way forward, as we see it, is to return the case to the district court for a proper, fulsome analysis of the historical tradition supporting § 922(g)(1)." *Id.*

But the timeline here is very different. Here, defendant filed a second motion to dismiss on August 15, 2022, prompted by the *Bruen* decision, and the government, in turn, responded to that motion on September 30, 2022. Dkt. 64, 68. Unlike the parties in *Atkinson*, therefore, the parties

---

[2] Dissenting in *Atkinson*, Judge Wood explained that she would have upheld § 922(g)(1) as constitutional. 70 F.4th at 1018-38.

7

here had several months after *Bruen* was decided to fully grapple with its methodological framework. Moreover, in rendering its December 2022 decision, this Court had that same opportunity. Dkt. 74. The Court's analysis reflects a keen understanding and application of *Bruen*'s methodological framework. *Id.* In other words, given the timeline, *Atkinson* did not change the relevant legal landscape for this particular case.

For similar reasons, in *United States v. Ernest Clark*, 20 CR 805 at Dkt. 145 (N.D. Ill. September 6, 2023) (Kendall, J.), the district court denied a motion for reconsideration of an earlier denial of a motion to dismiss an indictment alleging a violation of § 922(g)(1) on *Bruen*-based grounds. The court in *Clark* wrote:

> Unlike in *Atkinson* . . . the parties here had several months after *Bruen* was decided to fully grapple with its novel text-and-history framework. They did so in their briefing on Clark's motion to dismiss. This Court has applied *Bruen*'s framework in constitutional challenges to firearms regulations in both civil and criminal contexts. Likewise, this Court applied the *Bruen* analytical framework when denying Clark's Motion to Dismiss. The Court referenced its prior reasoning in *United States v. Dixon* to explain that "the prohibition on violent felons' possession of firearms in § 922(g)(1) remains constitutional under the test *Bruen* set out." *Atkinson* alters neither this Court's prior legal analysis nor the outcome for Clark.

*See Clark*, 20 CR 805, Dkt. 145 at 2.

In short, neither *Range* nor *Atkinson* provide a basis for this Court's reconsideration of its earlier motion to dismiss.

**B.      Defendant Ignores Post-*Bruen* Cases That, Like This Court, Have Upheld the Constitutionality of § 922(g)(5).**

Defendant does not bring to this Court's attention the several federal court opinions upholding § 922(g)(5)(A) as constitutional. These opinions post-date both *Bruen* and this Court's earlier denial of defendant's motion to dismiss and thus further support denying defendant's instant motion.

In *United States v. Sitladeen*, 64 F.4th 978, 985-87 (8th Cir. 2023), the Eighth Circuit rejected a facial challenge to § 922(g)(5)(A) and explained that immigrants who are unlawfully in the United States "are not part of 'the people' to whom the protections of the Second Amendment extend." Relying on its precedent in *United States v. Flores*, 663 F.3d 1022 (8th Cir. 2011), *Sitladeen* explained that § 922(g)(5) does not govern conduct that falls within the plain text of the Second Amendment. *Sitladeen*, 64 F.4th at 985. *Sitladeen* emphasized that *Flores* did not engage "in means-end scrutiny or some other interest-balancing exercise." *Id*. Instead, *Flores* considered "consistent with what *Bruen* now requires—whether the conduct regulated by § 922(g)(5)(A) was protected by the plain text of the Second Amendment." *Id*. *Sitladeen* determined it was not, "as unlawfully present aliens are not within the class of persons to which the phrase 'the people' refers," adding that "[n]othing in *Bruen* cast[ed] doubt on [the court's] interpretation of this phrase." 64 F.4th at 985 (citing *Bruen*, 142 S. Ct. at 2134).[3]

_____

[3] The government recognizes that in denying defendant's earlier motion to dismiss, this Court concluded differently than *Sitladeen* based on the Seventh Circuit's decision in *Meza Rodriguez*. Dkt. 74 at 3-5. The government notes, however, that the Seventh Circuit in *Atkinson* and multiple district courts within the Seventh Circuit have questioned *Meza Rodriguez*'s continued viability following *Bruen*. As *Atkinson* itself acknowledged, *Meza-Rodriguez* was written pre-*Bruen* and therefore did not have the benefit of *Bruen*'s recurrent use of—not just "passing reference" to—the phrase "law-abiding citizens" to describe the scope of the Second Amendment. *See Atkinson*, 70 F.4th at 1023 (recognizing that although the Seventh Circuit in *Meza-Rodriguez* "analyzed the scope of the Second Amendment right before *Bruen*," it has "not returned to the issue since then"); *see also United States v. Xavier Johnson*, 23 CR 156 at Dkt. 39, 2023 WL 6276562, at *2 (N.D. Ill. Sept. 26, 2023) (Kendall, J.) ("*Meza-Rodriguez* is also unhelpful because [in *Atkinson*] the Seventh Circuit acknowledged that *Meza-Rodriguez* was decided without the benefit of *Bruen* and thus, does not control whether Johnson's § 922(g)(1) conviction is constitutional under *Bruen*."); *United States v. Posey*, No. 2:22-CR-83 JD, 2023 WL 1869095, at *6 (N.D. Ind. Feb. 9, 2023) (explaining that while "[i]t is tempting to embrace the conclusion in *Meza*," "*Kanter* suggests that *Meza* did not actually decide this issue" and "[i]t is possible that in light of *Bruen*, the Seventh Circuit would reach a different conclusion based on additional guidance provided in that case and subsequent developments in other circuits"); *United States v. Crawford*, No. 2:20-CR-084-PPS-APR, 2023 WL 5559031, at *4 (N.D. Ind. Aug. 29, 2023) (observing similarly). The government therefore maintains its position, as set forth in its earlier response to defendant's motion to dismiss, that the Second Amendment's plain text does not cover the conduct of unlawful noncitizens, *Meza Rodriguez* notwithstanding and incorporates by reference arguments it has previously advanced in support of that position. Dkt. 68 at 4-9.

In addition, several district courts around the country have also upheld the constitutionality of § 922(g)(5), and the government is unaware of any that have held otherwise.[4]

In *United States v. Pineda-Guevara*, No. 5:23-CR-2-DCB-LGI, 2023 WL 4943609, at *6 (S.D. Miss. Aug. 2, 2023), the district court concluded that the Second Amendment does not convey rights to individuals who are unlawfully in the United States because they are not "law-abiding responsible citizens" or "members of the political community." Moving to the second prong of *Bruen*'s framework, *Pineda-Guevara* further held, like this Court held in denying defendant's prior motion to dismiss (Dkt. 74), that § 922(g)(5) is consistent with the nation's historical tradition of firearm regulation. 2023 WL 4943609 at *5 ("Despite Defendant's protestations, the Government has met this burden by citing numerous analogous historical restrictions enacted before, during, and after the American Revolution that disarmed individuals outside of the political community."). More specifically, *Pineda-Guevara* reasoned:

> The Government first noted that gun ownership laws two centuries ago ran parallel to those extending the franchise. The Government then cited colonial era laws that precluded certain groups from gun ownership without first swearing an oath of loyalty to the British crown. During the American Revolution, legislatures disarmed those who either refused to "swear[ ] fidelity to the revolutionary regime," "who defamed resolutions of the Continental Congress," or "who were unwilling to abide by ... legal norms." *Range v. Atty. Gen.*, 69 F.4th 96, 125 (3rd Cir. 2023) (Judge Krause, dissenting). These laws restricted from firearm ownership those already excluded from the political community of the time around the ratification of the Second Amendment. Therefore, they are analogous and "relevantly similar"

---

[4] In addition to those district court opinions specifically discussed herein, a number of other district courts have upheld the constitutionality of § 922(g)(5) since this Court did so in its ruling of December 19, 2022. Dkt. 74.  *See United States v. D'Luna-Mendez*, 2023 WL 4535718 (W.D. Tex. July 13, 2023);  *United States v. Vizcaíno-Peguero*, 2023 WL 3194522 (D. Puerto Rico. April 28, 2023); *United States v. Trinidad-Nova*, 2023 WL 3071412 (Puerto Rico. April 25, 2023); *United States v. Pierret-Mercedes,* 2023 WL 2957728 (D. Puerto Rico. April 14, 2023); *United States v. Murillo-Lopez*, 2023 WL 2799712 (E.D. Virginia April 05, 2023); *United States v. Leveille*, 2023 WL 2386266 (D. New Mexico. March 07, 2023); *United States v. Lovo-Serrano*, 2023 WL 1863164 (E.D. North Carolina, February 09, 2023); *United States v. DaSilva*, 2022 WL 17242870 (M.D. Pennsylvania. November 23, 2022). Multiple searches as recently as October 14, 2023 show no cases holding to the contrary.

> to the modern § 922(g)(5). Had the Court fully relied on this stage of the analysis, it would have held that the Government met its burden.

2023 WL 4943609 at *6 (cleaned up). Thus, *Pineda-Guevara* concluded that even if *Bruen* had abrogated Fifth Circuit precedent excluding illegal noncitizens from the text of the Second Amendment, § 922(g)(5) remained constitutional under the second prong of the *Bruen* analysis. *Id*. *See also United States v. Andrade-Hernandez*, No. 3:23-CR-26-DCB-LGI, 2023 WL 4831408, at *6 (S.D. Miss. July 27, 2023) (same).

The United States District Court for the Southern District of Texas reached a similar conclusion, also noting that even if *Bruen* abrogated Fifth Circuit precedent holding that illegal immigrants are excluded by the text of the Second Amendment, "the regulation still comports with historical traditions limiting the scope of" the Second Amendment. *See United States v. Medina-Cantu*, No. 22-cr-426, Dkt. 19 at 10 (S.D. Texas Jan. 10, 2023). In so doing, *Medina-Cantu* relied on this Court's earlier reasoning in denying defendant's prior motion to dismiss. *Id*. (citing Dkt. 74); *see also id*. (holding that "the historical context is sufficient to support the constitutionality of the statute prohibiting aliens illegally present in the United States from possessing a firearm").

The United States District Court for the Middle District of Tennessee also upheld the constitutionality of § 922(g)(5)(A) under the second prong of the *Bruen* test, the historical inquiry, because "§ 922(g)(5) is "relevantly similar" to Founding-era laws requiring oaths of allegiance to keep and bear arms." *United States v. Escobar-Temal*, No. 3:22-CR-00393, 2023 WL 4112762, at **3-6 (M.D. Tenn. June 21, 2023). The court acknowledged that the use of the term "the people" in the Constitution "may, in certain circumstances, encompass unlawfully present aliens." *Id*. at *3. But after reviewing the historical traditions of excluding certain groups not sufficiently loyal to the government from gun possession, *Escobar-Temal* explained that:

> Under current law, unlawful presence in the country is demarcated as a line of civic significance that symbolically defines the relationship between the state and individual, just as oath-taking was during the Founding-era . . . Thus, the how and why of oath-requiring laws are analogous to § 922(g)(5), establishing a history and tradition that supports the challenged law. Today's immigration system functions as an attempt to define the nation's members and nonmembers.

*Id*. at *5-6 (cleaned up).

In short, if there has been any change in the legal landscape since this Court's earlier denial of defendant's motion to dismiss, it is a change that only strengthens this Court's earlier analysis.

### C. This Court Properly Concluded That § 922(g)(5)(A) Is Consistent With This Nation's Historical Traditions.

This Court already has concluded that the government has met its burden of showing historically rooted limitations on noncitizens' right to bear arms. Dkt. 74 at 6. That conclusion was well-founded in light of the historical record establishing that legislatures categorically disarmed (1) individuals who were not members of the political community,[5] and (2) individuals who threatened the social order through their untrustworthy adherence to the rule of law. The government reiterates that historical record below, incorporating by reference its earlier arguments on this same point. *See also* Dkt. 68 at 11-18.

### 1. The Historical Record Supports the Categorical Disarmament of Individuals Who Are Not Members of the Political Community.

There is abundant precedent establishing that before, during, and after the American Revolution legislatures categorically disarmed individuals who were not members of the political

---

[5] The government has also argued that unlawful noncitizens' existence outside the "political community" also supports an argument that those noncitizens are not part of "the people" protected by the Second Amendment. *See, e.g.*, Dkt. 68 at 6-7. But the same arguments can also be used to support an argument that historical firearm regulations are sufficiently analogous to § 922(g)(5), so as to make that statute constitutional. *See United States v. Agee*, No. 1:21-CR-00350, 2023 WL 6443924, at *5 (N.D. Ill. Oct. 3, 2023) (explaining that the "legal disabilities to which the government cites" may be relevant "in evaluating a regulation under the Second Amendment"; "[t]he argument might very well be informative—after getting past the threshold issue of the plain text's coverage—in deciding whether there exists a historical *analogue* for the regulation at issue.") (emphasis in original).

community. S*ee also Perez*, 6 F.4th at 462 n.4 (Menashi, J., concurring in the judgment) ("[A]rms bearing and suffrage were intimately linked two hundred years ago and have remained so." (quotation marks omitted)).[6]

Under the English Bill of Rights, which "has long been understood to be the predecessor to our Second Amendment," the right to keep and bear arms was expressly limited to "Subjects." *Heller*, 554 U.S. at 593 (quoting Bill of Rights 1689, 1 W. & M., ch. 2, § 7, Eng. Stat. at Large 441); *see id*. ("By the time of the founding, the right to keep and bear arms had become fundamental for English *subjects*." (emphasis added)). And in colonial America:

> [T]he right to keep and bear arms "did not extend to all New World residents." Joyce Lee Malcolm, To Keep and Bear Arms: The Origins of an Anglo-American Right 140 (1996). While "[a]lien men . . . could speak, print, worship, enter into contracts, hold personal property in their own name, sue and be sued, and exercise sundry other civil rights," they "typically could not vote, hold public office, or serve on juries" and did not have "the right to bear arms" because these "were rights of members of the polity." Akhil Reed Amar, The Bill of Rights: Creation and Reconstruction 48 (1998).

*Perez*, 6 F.4th at 462 (Menashi, J., concurring in the judgment) (footnotes omitted). *Jimenez-Shilon*, 34 F.4th at 1047-48, explained the same:

> The individual right to bear arms enshrined in the English Declaration of Rights— which "has long been understood to be the predecessor to our Second Amendment"—was not made "available to the whole population." *Heller*, 554 U.S. at 593, 128 S. Ct. 2783. Instead, it was limited to the "Subjects which are Protestants, ... suitable to their Conditions, and as allowed by Law." 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441 (1689). We have found no historical evidence indicating that aliens shared this fundamental right with either natural-born Brits or denizens (who might be thought of as naturalized British subjects), both of whose relationships to the sovereign mirrored that of American "citizens." Indeed, the right to own guns in eighteenth-century England was statutorily restricted to the landed gentry. *See, e.g.*, Patrick J. Charles, *Armed in America* 51, 58 (2018); Giles Jacob, *A New Law-Dictionary* (1750) (unpaginated), *reprinted in The Complete Bill*

---

[6] This Court relied on *Perez* when denying defendant's first *Bruen*-based motion to dismiss an indictment. Dkt. 74 at 6.

> *of Rights: The Drafts, Debates, Sources, and Origins* 300 (Neil H. Cogan ed., 2d ed. 2015). And the English common law simultaneously made it such that "aliens [were] incapacitated to hold lands." *Bayard v. Singleton*, 1 N.C. 5, 9 (1787) *1047 (emphasis omitted); *see Dawson's Lessee v. Godfrey*, 8 U.S. (4 Cranch) 321, 323–24, 2 L.Ed. 634 (1808); Blackstone, *supra*, at *372.

See also *Carpio-Leon*, 701 F.3d 974, 980 (4th Cir. 2012) ("In England, the right to bear arms allowed the government to disarm those it considered disloyal or dangerous.").

Accordingly, colonial-era statutes did not extend the right to bear arms to those who were, at the time, not considered part of the citizenry who swore allegiance to the United States. For instance, Massachusetts and Virginia forbade the arming of Native Americans, *see* Malcolm, *supra*, at 140, and Virginia also prohibited Catholics from owning arms unless they swore "allegiance to the Hanoverian dynasty and to the Protestant succession," *see* Robert H. Churchill, Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment, 25 L. & Hist. Rev. 139, 157 (2007).[7]

---

[7] The government acknowledges that some of the categorical prohibitions to which it cites "would be impermissible today under other constitutional provisions," but as the Court in *United States v. Jackson* recognized, "they remain relevant in determining the historical understanding of the right to keep and bear arms." 69 F.4th 495, 503 (8th Cir. 2023). Several other judges and courts have reasoned the same. *See, e.g.*, *Range*, 69 F.4th at 122 n.50 (Krause, J., dissenting) (rejecting these "bigoted and unconstitutional laws" but citing them to demonstrate the "tradition of categorical, status-based disarmaments"); *Atkinson*, 70 F.4th at 1035-36 (Wood, J., dissenting) ("Though some of those laws would no longer pass muster under the Equal Protection Clause, they reveal conclusively the scope of governmental power that was understood to exist at the time the Second Amendment was adopted."); *Agee*, 21 CR 350, 2023 WL 6443924, at *8 (Chang, J.) (writing that "the inquiry here is not whether those laws violated the Equal Protection Clause but instead the 'historical tradition that delimits the outer bounds' of the Second Amendment" and "noting that the right to equal protection—via the Due Process Clause of the Fifth Amendment—was not interpreted as applying to federal laws until the mid-20th century, well after the ratification of the Second Amendment."). *United States v. Reichenbach*, No. 4:22-CR-00057, 2023 WL 5916467, at *8 (M.D. Pa. Sept. 11, 2023) ("early laws would today rightly be considered odious, as they prohibited racial minorities, religious minorities, and those who would not swear oaths of loyalty to a particular state from possessing firearms," yet where these same laws "were targeted at groups that lawmakers deemed dangerous and disruptive, and the laws sought to protect the public from violence and disorder," they remain relevant to *Bruen's* methodological approach); *United States v. Andrew Lane*, No. 5:22-CR-132, 2023 WL 5614798, at *5 (D. Vt. Aug. 24, 2023) ("With the benefit of hindsight, bans on possession of firearms by Catholics, for example, are offensive, and they would certainly be unconstitutional today. . . . But the court is tasked neither with judging the propriety of such historical laws by modern norms nor their constitutionality.")

In the same vein, during the American Revolution, colonial governments disarmed persons who refused to "swear an oath of allegiance to the state or the United States." Saul Cornell & Nathan DeDino, A Well Regulated Right: The Early American Origins of Gun Control, 73 Fordham L. Rev. 487, 506 (2004); *see id*. at 506 nn.128-129 (collecting statutes); *see generally* Churchill, *supra* at 159 ("[T]he new state governments . . . framed their police power to disarm around a test of allegiance.").

During the ratification debates, the New Hampshire ratification convention proposed an amendment stating that "Congress shall never disarm any *Citizen* unless such as are or have been in Actual Rebellion" (emphasis added), while delegates urged the Massachusetts convention to propose a similar amendment guaranteeing "peaceable *citizens*" the right to keep arms. (emphasis added). 2 Bernard Schwartz, The Bill of Rights: A Documentary History 681, 761 (1971); *see Heller*, 554 U.S. at 604 (considering ratification conventions' proposals). Accordingly, "State constitutions in the early republic continued a similar practice by restricting the right to keep and bear arms to citizens." *Perez*, 6 F.4th at 462-63 (*citing* Churchill, *supra*, at 159-60).

The Bill of Rights codified this understanding of the right to bear arms as being connected with citizenship as membership in and preservation of the political community. *See McDonald*, 561 U.S. 742, 769-70 (2010) ("The right of *the citizens* to keep and bear arms has justly been considered, as the palladium of the liberties of a republic; since it offers a strong moral check against the usurpation and arbitrary power of rulers; and will generally, even if these are successful

___

(*citing* Joseph Blocher & Caitlan Carberry, *Historical Gun Laws Targeting "Dangerous" Groups and Outsiders*, 1, 12 (Duke L. Sch. Pub. L. & Legal Theory Series No. 2020-80), https://perma.cc/V68C-5HEF ("[O]ne can accept that the Framers denied firearms to groups they thought to be particularly dangerous (or unvirtuous, or irresponsible) without sharing their conclusion about which groups qualify as such.")).

in the first instance, enable the people to resist and triumph over them." (quoting 3 J. Story, 3038 Commentaries on the Constitution of the United States § 1890, p. 746 (1833)) (emphasis added)).

In addition, the Second Amendment is connected to the concept of "a well organized militia." However, "the conception of the militia at the time of the Second Amendment's ratification was the body of all *citizens* capable of military service." *Heller*, 554 U.S. at 628 (emphasis added). *See Perez*, 6 F.4th at 462 (Menashi, J., concurring in the judgment) (explaining the history that "non-citizens . . . were neither expected, nor usually allowed, to participate in the militia" (quotation marks omitted)); *Jimenez-Shilon*, 34 F.4th at 1047-48 (describing history of "disarmament of groups associated with foreign elements," including "on the ground of alienage" (quotation marks omitted)). There was no suggestion that any states were viewed at the time as lacking the authority to exclude noncitizens from the right to bear arms. *See Bruen*, 142 S. Ct. at 2133 (where there were "no disputes regarding the lawfulness of [certain] prohibitions," one "can assume it settled" that those prohibitions are "consistent with the Second Amendment").

Defendant contests the notion that, historically, only members of a political community enjoyed the right to keep and bear arms. He argues instead that "gun regulation" depended "on a conception of membership in the national community contingent upon race, wealth, and gender." Dkt. 83 at 8. But in making this assertion, defendant does not acknowledge historical traditions that permitted the categorical disarmament of even free, Christian, white men "whom the authorities believed could not be trusted to obey the law" and therefore were deemed outside the political community. *Range*, 69 F.4th at 122 (Krause, J., dissenting); *see also Agee*, 21 CR 350, 2023 WL 6443924, at *9. Nor does defendant grapple with the notion that "political community" and "national community" are different terms that mean different things. *See, e.g., United States v. Lane*, No. 3:23CR62 (RCY), 2023 WL 5663084, at *11-12 (E.D. Va. Aug. 31, 2023) (in the

16

context of a § 922(g)(1) constitutional challenge, reasoning that "political community" (as defined in *Heller*) and "national community" (as defined in *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990)), "clearly mean very different things" for purposes of the Second and Fourth Amendments, respectively, and that individuals can still be part of the national community "despite losing political rights"). And finally, defendant does not grapple with the significance of *Heller*'s explicit decision to use the term "political community," rather than "national community," when delineating the individual right to keep and bear arms. *See Heller*, 554 U.S. at 580 (extending the Second Amendment's protections only to "members of the political community").

In sum, where defendant does not dispute that he is not a citizen of the United States—and where historical traditions allowed for the categorical disarmament of individuals who were not citizens or members of the political community—§ 922(g)(5) remains constitutional under the second prong of *Bruen*'s methodology.

> **2.    The Historical Record Supports the Categorical Disarmament of Individuals Could Not Be Trusted To Adhere to the Law and Therefore Posed a Danger to Society.**

Separately, by the time the Second Amendment was ratified in 1791, there was an established tradition of legislatures exercising broad authority to disqualify people categorically from possessing firearms based on a judgment that certain groups simply could not be trusted to adhere to the rule of law. That historical tradition bears on the constitutionality of § 922(g)(5), as that statute prohibits individuals from possessing firearms where those individuals have failed to adhere to the rule of law in becoming residents of the United States.

The tradition of disarming untrustworthy adherents to the law began (in relevant part) in early England. In 1689, for example, the English government passed a law disarming Catholics who refused to make declarations renouncing their faith and, in so refusing, conveyed to the sovereign their unwillingness to adhere to English law. 1 W. & M., Sess. 1, c. 15, in 6, *The Statutes*

*of the Realm* 71-73 (1688).[8] This "Act for the better secureing the Government by disarming Papists and reputed Papists" provided that a Catholic could not "have or keepe in his House or elsewhere" any "Arms[,] Weapons[,] Gunpowder[,] or Ammunition (other than such necessary Weapons as shall be allowed to him by Order of the Justices of the Peace . . . for the defence of his House or person)." *Id.*; *see also Jackson*, 69 F.4th at 502. Enacted shortly after the Glorious Revolution of 1688—when Protestant King William and Queen Mary succeeded Catholic King James II—the statute reflected the new government's perception that Catholics who refused to renounce their faith (and thus their allegiance to the Pope) could not be trusted to obey English law. *Range*, 69 F.4th at 121-22 (Krause, J., dissenting); *see also Jackson*, 69 F.4th at 502. This categorical disarmament was based on a concern with a group's propensity to disobey the sovereign. *Range*, 69 F.4th at 121-22 (Krause, J., dissenting). *See also Heller*, 554 U.S. at 592-93 ("Between the Restoration and the Glorious Revolution, the Stuart Kings Charles II and James II succeeded in using select militias loyal to them to suppress political dissidents, in part by disarming their opponents.") (Scalia, J.). In her oft-cited dissent in *Kanter v. Barr*, then-Judge Barrett also observed that the English Parliament disarmed Catholics, although her analysis focused on the "threatened violence and the risk of public injury" that Catholics (and later on, slaves and Native Americans) were presumed to present as the primary reason for disarmament. 919 F.3d 437, 456–58 (7th Cir. 2019). But even then-Judge Barrett's dissent recognized "that [the English] Parliament disarmed Catholics because the Protestant majority found them 'untrustworthy.'" *Id.* at 457 (citing

---

[8] Though the statutory compilation identifies this as a 1688 act, it was enacted in 1689. *See* 14 *Journals of the House of Lords* 1685-1691, at 208-09 (1767-1830) (reflecting enactment on May 11, 1689); *Bill of Rights* [1688], https://www.legislation.gov.uk/aep/WillandMarSess2/1/2 (explaining that "[i]t appears that all the Acts of" the first Parliament of William and Mary "were treated as being Acts of 1688" in official sources under an "old method of reckoning"—including the English Bill of Rights, discussed shortly, which was similarly enacted in 1689).

Adam Winkler, *Gunfight: The Battle over the Right to Bear Arms in America* 113–18 at 115 (2011)).

A focus on untrustworthiness, for purposes of disarmament, has other historical roots. For instance, "[f]ollowing the tumult of the English Civil War, the restored Stuart monarchs disarmed nonconformist (*i.e.*, non-Anglican) Protestants," even though such nonconformists included pacifist denominations like the Quakers. *Range*, 69 F.4th at 120-21 (Krause, J., dissenting) (collecting sources). Like the Catholics before them, such groups "often refused to take mandatory oaths acknowledging the King's sovereign authority over matters of religion" and, as a result, "Anglicans accused nonconformists of believing their faith exempted them from obedience to the law." *Id.* Their commitment to non-violence did not spare their firearms; instead, these groups were categorically disarmed because—like the unlawful residents on which § 922(g)(5) focuses— their actions reflected an unwillingness to adhere to legal conventions. *See also Jackson*, 69 F.4th at 504 ("Not all persons disarmed under historical precedents—not all Protestants or Catholics in England, not all Native Americans, not all Catholics in Maryland, not all early Americans who declined to swear an oath of loyalty—were violent or dangerous persons" and yet they were disarmed nonetheless); *Range*, 69 F.4th at 124-26 (Krause, J., dissenting) (noting that colonial- and Revolutionary-war-era laws disarmed "sizable numbers of pacifists" such as the Quakers, Moravians, and Mennonites, "not . . . because they were dangerous, but rather because their refusal to swear allegiance demonstrated that they would not submit to communal judgments in law when it conflicted with personal conviction").

The aforementioned examples from England are particularly relevant because the same Parliament wrote the 1689 English Bill of Rights, which "enshrined basic civil liberties" and became the predecessor to our Second Amendment. *Bruen*, 142 S. Ct. at 2141; *Heller*, 554 U.S. at

593; *Atkinson*, 70 F.4th at 1031 (Wood, J., dissenting). That predecessor specified that "*Protestants* may have Arms for their Defence suitable to their Conditions *and as allowed by Law.*" 1 W. & M., Sess. 2, c. 2, in 6 *The Statutes of the Realm* 143 (1688) (emphases added); *see also Jackson*, 69 F.4th at 502; *Atkinson*, 70 F.4th at 1031 (Wood, J., dissenting). "Englishmen had never before claimed the right of the individual to arms." *Bruen*, 142 S. Ct. at 2142 (quotation marks and citation omitted). And yet when they first formally claimed that right, the English ensured that the Parliament retained the power—which it in fact exercised—to arm one class of the population and to disarm another based on concerns that the members of that latter class would not abide by the law. *See Atkinson*, 70 F.4th at 1031 ("Not quite a ringing endorsement of an untrammeled right to keep and bear arms, it instead builds in the idea that this right exists 'as allowed by law.'") (Wood, J., dissenting).

These prohibitions that were rooted in English law continued as the American colonies were settled and the United States codified an independent nation. Like their English predecessors, throughout the Revolutionary War, American legislatures passed numerous disarmament laws targeting those who failed to demonstrate loyalty to the emerging American government.

An early example is a 1775 Connecticut law providing that any person convicted of "libel[ing] or defam[ing]" any acts or resolves of the Continental Congress or the Connecticut General Assembly "made for the defence or security of the rights and privileges" of the colonies "shall be disarmed and not allowed to have or keep any arms." The Public Records of the Colony of Connecticut From May, 1775 to June, 1776, at 193 (1890) (1775 Conn. law). In 1776, the Continental Congress recommended that colonial governments disarm those who were "notoriously disaffected to the cause of America" or who simply "have not associated" with the colonial governments in the war effort. 4 Journals of the Continental Congress 1774-1789, at 205

20

(1906) (resolution of March 14, 1776). At least six of the colonies enacted legislation in this vein. *See* The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay 479-84 (1886) (1776 Mass. law); 7 Records of the Colony of Rhode Island and Providence Plantations in New England 567 (1862) (1776 R.I. law); 1 The Public Acts of the General Assembly of North Carolina 231 (1804) (1777 N.C. law); Acts of the General Assembly of the State of New-Jersey at a Session Begun on the 27th Day of August, 1776, at 90 (1777) (1777 N.J. law); 9 The Statutes at Large of Pennsylvania from 1682 to 1801, at 112-13 (1903) (1777 Pa. law); 9 The Statutes at Large; Being A Collection of All the Laws of Virginia 282 (1821) (1777 Va. law); *see also Jackson*, 69 F.4th at 503 ("In the era of the Revolutionary War, the Continental Congress, Massachusetts, Virginia, Pennsylvania, Rhode Island, North Carolina, and New Jersey prohibited possession of firearms by people who refused to declare an oath of loyalty."); *Atkinson*, 70 F.4th at 1034 (Wood, J., dissenting) ("During the American Revolution, several states passed laws providing for the confiscation of weapons owned by persons who refused to swear an oath of allegiance to the state or to the United States.").[9]

As noted earlier, a common feature of early laws was to require oaths of loyalty to the government and to strip anyone who failed or refused to take the oath of the right to bear arms. *See, e.g.,* 1776 Mass. law at 479-80; 1776 R.I. law at 566-67; 1777 N.C. law at 229-31; 1777 Pa. law; at 111-13; 1777 Va. law at 281-82. Many of these laws provided that failing or refusing to take the oath resulted in forfeiture of a bundle of additional political rights, including the rights to

---

[9] Massachusetts, for example, disarmed the supporters of an outspoken preacher in the 1630s "not because those supporters had demonstrated a propensity for violence," but because "the authorities concluded their conduct evinced a willingness to disobey the law." *Range*, 69 F.4th at 123 (Krause, J., dissenting) (citing Edmund S. Morgan, The Case Against Anne Hutchinson, 10 New Eng. Q. 635, 637-38, 644, 648 (1937)); Ann Fairfax Withington & Jack Schwartz, The Political Trial of Anne Hutchinson, 51 New Eng. Q. 226, 226 (1978); James F. Cooper, Jr., Anne Hutchinson and the "Lay Rebellion" Against the Clergy, 61 New Eng. Q. 381, 391 (1988); John Felipe Acevedo, *Dignity Takings in the Criminal Law of Seventeenth-Century England and the Massachusetts Bay Colony*, 92 Chi.-Kent L. Rev. 743, 761 (2017)).

vote, to serve on juries, and to hold public office—further reinforcing the longstanding connection between arms-bearing and these political rights. *See supra* at 23; *see also, e.g.*, 1776 Mass. law at 481; 1777 N.C. law at 231; 1777 Pa. law at 112-13; 1777 Va. law at 282. *See also* Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 506 (2004); *see id.* at 506 nn.128-29 (compiling statutes); *see also* Churchill, *supra*, 25 L. & Hist. Rev. at 159 ("[T]he new state governments . . . framed their police power to disarm around a test of allegiance.").

Section 922(g)(5)(A) fits comfortably within these historical traditions. *See, e.g., Meza-Rodriguez*, 798 F.3d at 673. Noncitizens without lawful status have, by definition, "already violated a law of this country" by entering or remaining in the United States illegally. *United States v. Toner*, 728 F.2d 115, 128 (2d Cir. 1984). Further, noncitizens without lawful status may be less likely to comply with the identification and recordkeeping requirements associated with purchasing firearms from licensed dealers, because they often live "largely outside the formal system of registration, employment, and identification" and can be "harder to trace and more likely to assume a false identity." *Huitron-Guizar*, 678 F.3d at 1170. Noncitizens without lawful status also "have an interest in eluding law enforcement," creating a risk that they could misuse firearms against immigration authorities attempting to apprehend them. *Meza-Rodriguez*, 798 F.3d at 673; *cf.* 18 U.S.C. § 922(g)(2) (disarming fugitives). Congress could thus reasonably conclude that the noncitizens who fall within § 922(g)(5)(A) should be disarmed.

It does not matter that the Founding-era laws are not identical to § 922(g)(5)(A). *Bruen* recognized that courts should be mindful of changing societal conditions in evaluating how closely a challenged regulation must conform to historical precedent. The key question under *Bruen* is "whether modern and historical regulations impose a comparable burden on the right of armed

self-defense and whether that burden is comparably justified." 142 S. Ct. at 2133. In this regard, the government need not identify "a dead ringer for historical precursors"; "a well-established and representative historical analogue" will suffice. *Id.* (emphasis omitted). The historical markers identified above — disarming individuals who lacked membership in the political community or who were unwilling to comply with the law — plainly align with § 922(g)(5)(A)'s prohibition. Compared to those historical regulations, § 922(g)(5)(A) imposes an identical burden on the right to armed self-defense. That burden is also "comparably justified." *Id.* At the time of the founding, disarmament was considered necessary to protect against the danger to the "civic community" posed by those refusing to abide by its legal and social norms. *See Range*, 53 F.4th at 275-77. Section 922(g)(5)(A) is similarly justified by an illegally present non-citizen's lack of membership in the political community and the challenges presented by their possession of firearms.

One final consideration merits mention in this inquiry. As the government has previously argued (*see* Dkt. 46 at 15-17, 68 at 23), courts traditionally afford Congress significant deference in matters relating to citizenship and immigration. "[T]he responsibility for regulating the relationship between the United States and our alien visitors"-determinations about which noncitizens should be allowed to enter and remain in the United States and the terms and conditions imposed upon such noncitizens while they are here-is "committed to the political branches" of government. *Mathews v. Diaz*, 426 U.S. 67, 81 (1976). In exercising that power, "Congress regularly makes rules that would be unacceptable if applied to citizens." *Id.* at 80. And because Congress's "power over aliens is of a political character," its exercise of that power is "subject only to narrow judicial review." *Hampton v. Mow Sun Wong*, 426 U.S. 88, 101-02 n.21 (1976); *see Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210 (1953) (holding that congressional power over noncitizens is "largely immune from judicial control"). Congress was entitled to

determine that noncitizens who are unlawfully present in the United States, and are therefore potentially subject to removal, should not be permitted to possess firearms while they are here. That consideration further confirms what the historical record shows: § 922(g)(5)(A) reflects a lawful regulatory measure.

### D. Construed as an As-Applied Challenge, Defendant's Motion Still Fails.

In the alternative, defendant once again argues that § 922(g)(5) is unconstitutional as applied to him because he is a long-time resident of the United States. Dkt. 83 at 12 (describing himself as "a hard-working individual that is part of the backbone of what makes this country great, and is proud to call himself an American"). This argument already has been raised by defendant, to no avail. Dkt. 28, 32, 43 (¶¶ 26-28), 64. Defendant's as-applied challenge still fails for several reasons.

First, the Seventh Circuit has never actually upheld an "as applied" Second Amendment challenge to § 922(g) and has, in fact, "repeatedly rejected as-applied Second Amendment challenges" to that statute. *See Kanter,* 919 F.3d at 443. Certainly, the Seventh Circuit in *Kanter* noted that it "left room for as-applied challenges" to § 922(g). 919 F.3d at 443. But, to date, the Seventh Circuit has not accepted any such challenge.

Second, although defendant argues that an as-applied "analysis requires a . . . very personal look" at defendant (Dkt. 83 at 12), in fact, defendant has proffered no historical evidence to support a position that the constitutionality of § 922(g)(5) turns on individualized assessments. This is a flawed analysis that the *Atkinson* panel majority also noted:

> [A]lthough Atkinson has shown some support for the idea that a group's "dangerousness" is what mattered to the Founders, he does not provide much historical basis for individualized assessments or for delineating between individuals who committed violent versus non-violent crimes. The distinction is not an obvious consequence of many of the laws that Atkinson, and his amicus especially, discuss.

70 F.4th at 1023; *see also id.* ("Atkinson's historical analysis falls short."). Instead, as detailed above, the historical tradition supports the legislature's ability to disarm *categories* of individuals. *See Atkinson*, 70 F.4th at 1035 (Wood, J., dissenting) ("since the founding, governments have been understood to have the power to single out categories of persons who will face total disarmament"); *Jackson*, 69 F.4th at 504 ("Legislatures historically prohibited possession by categories of persons . . . ."); *Kanter*, 919 F.3d at 464 (Barrett, J., dissenting) (disarmament "is not limited to case-by-case exclusions of persons who have been shown to be untrustworthy with weapons"); *United States v. Booker*, 644 F.3d 12, 23 (1st Cir. 2011) (pre-*Bruen*, explaining that "the Second Amendment permits categorical regulation of gun possession by classes of persons . . . rather than requiring that restrictions on the right be imposed only on an individualized, case-by-case basis"). The relevant question, in other words, is whether the status at issue indicates under the *Bruen* analysis that the person cannot be trusted to use a gun responsibly, not whether each individual can be trusted to do so.[10]

Third, there is no question that the defendant is a noncitizen who is unlawfully present in this country. That fact remains no matter how long defendant has been in the United States or how

---

[10] Individualized assessments could also yield wildly disparate results. *See, e.g., Atkinson*, 70 F.4th at 1027 (Wood, J., dissenting) (suggesting that enabling individuals to seek to establish a case-specific exemption from a generally applicable criminal law would create "an arbitrary patchwork of decisions—as far from the rule of law as one could image"); *United States v. Torres-Rosario*, 658 F.3d 110, 113 (1st Cir. 2011) (individualized exemptions would "obviously present serious problems of administration, consistency and fair warning"). And in the criminal context, in particular, the opportunity for pre-trial fact-finding is limited by Federal Rule of Criminal Procedure 12, which makes such as-applied challenges difficult to administer and resolve before trial if individualized facts, at least those relevant to the crime itself (like a § 922(g)(3) offense), are relevant. *See, e.g., United States v. Pope*, 613 F.3d 1255 (10th Cir. 2010) (Gorsuch, J.) (concluding that as-applied Second Amendment challenge to § 922(g)(9) could not be brought pre-trial because the defendant "contends the statute is unconstitutional only in light of the 'facts surrounding the commission of the alleged offense'—the very facts a court may not consider before trial" (citation omitted)); Fed. R. Crim. P. 12(b)(3) (limiting pretrial motions to motions that "can be determined without a trial on the merits").

he has spent his time here. Any attempt to specifically exempt himself from the scope of § 922(g)(5) fails.[11]

## III.    CONCLUSION

For the reasons stated above, the Court should deny defendant's renewed motion to dismiss the indictment.

Respectfully Submitted,

MORRIS PASQUAL
ACTING UNITED STATES ATTORNEY

/s/ Sheri H. Mecklenburg
Sheri H. Mecklenburg
Assistant United States Attorney
United States Attorney's Office
219 S. Dearborn Street, Suite 500
Chicago, IL 60604
Telephone: 312-353-5300

Date: October 16, 2023

---

[11] The government notes that it contests many of the factual assertions defendant makes in his motion regarding his offense conduct and his history in the United States. For example, defendant claims that he was armed on June 1, 2020, because he had taken up the "heavy duty" as a "husband and father" of defending the Little Village neighborhood from "lawlessness" that engulfed it. Dkt. 83 at 6. The video that the government has provided to the Court demonstrates that defendant was not using the gun for defense. It shows defendant walking down the street, taking an aiming stance and shooting multiple times at occupants of random passing cars that were not engaging in lawless conduct. Dkt. 48. Moreover, defendant's family did not live in the Little Village neighborhood, but resided in a suburb, Cicero. Defendant also refers to himself as a "DREAM-er," (Dkt. 83 at 5), although he never previously applied for such status under the Deferred Action for Childhood Arrivals ("DACA") program or taken steps before his arrest to make lawful his presence in the United States. Other "individualized factors" cited by defendant for an as applied exception (Dkt. 83, at 5), such as defendant's marriage to an American citizen, or steps he claims he has taken to make lawful his presence in the United States, occurred *after* the date of defendant's arrest, i.e., after defendant had violated § 922(g)(5). This Court previously addressed defendant's subsequent obtaining of identification as unable to overcome the government's "strong interest in prohibiting those with an interest in eluding law enforcement from possessing firearms, such as unauthorized noncitizens." *See* Dkt. 57 at 3-4, citing *Meza-Rodriguez*, 798 F.3d at 673.