IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA
     Plaintiff,

                             Case No. 20CR613

v.

Heriberto Carbajal-Flores,
     Defendant.

---

## DEFENDANT'S REPLY TO HIS RENEWED SECOND MOTION TO DISMISS INDICTMENT UNDER THE SECOND AMENDMENT OF THE U.S. CONSTITUTION

Regardless of how Defendant Carbajal-Flores (hereinafter, "Mr. Carbajal-Flores") has styled his motion, this Court should not divert attention to the Government's confusion between a motion for reconsideration versus a renewed motion. As noted in the Government's Response Brief, a court may re-hear an issue when "(1) the court has patently misunderstood a party; (2) the court has made a decision outside the adversarial issues presented to the court by the parties; (3) the court has made an error not of reasoning but of apprehension; (4) *there has been a controlling or significant change in the law since the submission of the issue to the court;* or (5) there has been a controlling or significant change in the facts since the submission of the issue to the court." *River Vill. W. LLC v. Peoples Gas Light & Coke Co.*, 618 F. Supp. 2d 847, 850 (N.D. Ill. 2008) (emphasis added) (citing *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990)); *see also Government's Response to Defendant's Renewed Second Motion to Dismiss Indictment*, p. 5.

In this case, there have in fact been significant changes in the law since Mr. Carbajal-Flores's initial *Second Motion to Dismiss Indictment Under the Second Amendment of the U.S. Constitution* (hereinafter, "Initial Motion to Dismiss") was decided by this Court on December 19, 2022. Specifically, since the filing of Mr. Carbajal-Flores's Initial Motion to Dismiss where he argued that 18 § 922(g)(5) was unconstitutional following the Supreme Court's holding in *New York State Rifle & Pistol Associations, Inc., et al. v. Bruen, Superintendent of New York State Police, et al.*, 142 S. Ct. 2111 (2022), there have been additional cases decided that add to the post-*Bruen* analysis of "the people" by offering guidance on how to properly determine which individuals should ultimately be restricted under the various subsections of § 922. *See Range v. Attorney General United States*, 2023 U.S. App. LEXIS 13972 * (3d Cir. 2023) (holding 18 U.S.C. § 922(g)(1) as unconstitutional in an as-applied challenge because the government failed to show "that our Nation's history and tradition of firearm regulation support disarming Range")*; Patrick Atkinson v. Merrick B. Garland*, 70 F.4th 1018 (7th Cir. 2023) (emphasizing the newly added complexity of the history and tradition analysis under the Second Amendment following the Supreme Court holding in *Bruen*); *see also Bruen*, 142 S. Ct. at 2111, 2157 (Alito, J., concurring) ("Our holding decides nothing about who may lawfully possess a firearm . . .."). Coincidentally, in a facial challenge to § 922(g)(1), a recent holding in this district specifically has opted to follow the *Atkinson* analysis while attempting to define "the people" in *United States v. Prince*, further reiterating the importance of this Court's consideration of both *Range* and

*Atkinson* in its analysis. 1:22-cr-00240 (N.D. Ill. Nov. 2, 2023) (following the reasoning of *Atkinson*). As we can see with this district's holding in *Prince*, utilizing such cases will ultimately aid in creating a much-needed stable and proper test to further define "the people" under the Second Amendment in general, inclusive of immigrants that also meet the standards to bear arms. *See District of Columbia v. Heller*, 554 U.S. 570, 580 (2008) (explaining "the people" as used throughout the Constitution "unambiguously refers to all members of the political community, not an unspecified subset"); *Bruen*, 142 S. Ct. 2111, 2156 (2022) (determining that the subject New York statute "violates the Fourteenth Amendment in that it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms").

The analysis in both *Range* and *Atkinson* make it clear that certain groups of individuals cannot collectively be viewed as all similarly situated post-*Bruen*. Instead, courts should consider a deeper analysis of the historical traditions and their application to certain exception groups that do not arise to the level of those that should in fact be stripped of their right to bear arms. *See Range*, 2023 U.S. App. LEXIS at 13972 * (holding that citizens are not "law abiding" if they are "unwilling to obey the government and its laws, whether or not they had demonstrated a propensity for violence"); *Atkinson*, 70 F.4th at 1018 (holding that, although the individual at issue was considered a felon as defined by the law, the courts found that he was, nevertheless, not the kind of felon the law was meant to disarm). And, as other courts lean on the analysis given in *Range* and *Atkinson*, it is

only a matter of time in which a court will ultimately (and properly) utilize that same analysis for other restrictive statutes denying Second Amendment rights. *See Prince*, 1:22-cr-00240, p. 7 ("Where lower courts have . . . engaged in insufficient historical review, their analysis does not meet [ ] the standard set out in *Bruen*").

The Government attempts to argue that neither *Range* nor *Atkinson* deal with the statute at issue in this matter, and are therefore irrelevant. While it is true that those cases, as well as *Prince*, address § 922(g)(1), a distinctly different subsection of § 922, they nevertheless address the issue of who qualifies as "the people"–and as such, have a right to bear arms–under the Second Amendment. *See Range*, 2023 U.S. App. LEXIS 13972*; Atkinson*, 70 F.4th at 1018. Therefore, the guidance we can garner from these cases (which is substantial, as detailed below) in aiding on how to proceed with § 922(g)(5) is significantly important and serves as a significant change in this ever-quickly evolving law as it applies to Second Amendment restrictions generally, not just § 922(g)(1). *See Prince*, 1:22-cr-00240 (following *Atkinson* in garnering a detailed analysis of historical laws and traditions, noting the failure of past courts to conduct such a proper analysis, pre- or post-*Bruen*).

The analysis of § 922(g)(1) by both *Range* and *Atkinson* included the consideration of certain factors that aided in the courts concluding that not all felons are the same, and therefore, not all felons should be stripped of their right to bear arms under the Second Amendment. See *Range*, 2023 U.S. App. LEXIS 13972* (finding that the historical analysis requires a determination that the historical

regulation being presented in support of the present-day regulation is "relevantly similar"); *Atkinson*, 70 F.4th at 1024 (tasking itself with the analysis of determining whether or not the government met its burden of "affirmatively prov[ing] that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms" while noting the complexity of such an analysis); *see also Prince*, 1:22-cr-00240 (utilizing the detailed analysis in *Atkinson* as guidance to determine if the defendant qualified as part of "the people" under the Second Amendment). Much like *Range* and *Atkinson* had to grapple with, and has subsequently opened up, a pandora-type box of questions as it applies to felons (i.e., the difference between state and federal felonies, violent and non-violent felons, and jail time served versus a probationary sentence only; the length of time between the initial conviction and the charge under § 922; and the record of that particular felon), the same can be said about similar questions that deserve analysis under § 922(g)(5) as it applies to undocumented immigrants. And similarly, the guidance we get from *Prince*, offers further guidance in the significance and complexity of the historical and traditional analysis required for both a facial and an as-applied challenge to the restrictive subsections of § 922.

While the court in *Range* began the post-*Bruen* analysis of determining who was exactly made up "the people" collectively under the Second Amendment for purposes of restrictive laws, the court in *Atkinson* placed further significance on the creation of a non-exhaustive list of questions to consider when contemplating an as-applied challenge, having instructed the government to develop a record that

addresses a series of 'interrelated and non-exhaustive questions' which are intended to 'help focus the proper analysis on remand.'" *Atkinson*, 70 F.4th at 1023. Specifically, the questions demanded by the *Atkinson* court included:

1. Does § 922(g)(1) address a 'general societal problem that has persisted since the 18th century?' … If this problem existed during a relevant historical period, did earlier generations address it with similar or 'materially different means?';

2. What does history tell us about disarming those convicted of crimes generally and felonies in particular? Among other sources, the parties could look to commentary from the Founders, proposals emerging from the states' constitutional ratifying conventions, any actual practices of disarming felons or criminals more generally around the time of the Founding, and treatment of felons outside of the gun context (to the extent this treatment is probative of the Founders' views of the Second Amendment). When considering historical regulations and practices, the key question is whether those regulations and practices are comparable in substance to the restriction imposed by § 922(g)(1). To answer the question, the district court and the parties should consider how the breadth, severity, and the underlying rationale of the historical examples stack up against § 922(g)(1);

3. Are there broader historical analogues to § 922(g)(1) during the periods that *Bruen* emphasized, including, but not limited to, laws disarming 'dangerous' groups other than felons? The parties should not stop at compiling lists of historical firearms regulations and practices. The proper inquiry, as we have explained, should focus on how the substance of the historical examples compares to § 922(g)(1);

4. If the district court's historical inquiry identifies analogous laws, do those laws supply enough of a historical tradition (as opposed to isolated instances of regulation) to support § 922(g)(1)? On this front, the parties should provide details about the enforcement, impact, or judicial scrutiny of these laws, to the extent possible;

5. If history supports Atkinson's call for individualized assessments or for a distinction between violent and non-violent felonies, how do we define a non-violent or a non-dangerous felony? And what evidence can a court consider in assessing whether a particular felony conviction was violent? For instance, can a court consider the felony conviction itself, the facts of the underlying crime, or sentencing enhancements? *Bruen* shows that these distinctions should also have firm historical support. *See* 142 S. Ct. at 2132-33 (explaining that the court must assess whether modern and historical regulations are 'relevantly similar,' including in terms of how and why the regulations burden gun rights)."

*Id.* at 1023-24. Then, most recently, the court in *Prince* further demanded an exhaustive analysis of not merely the justifications of such modern restrictive laws in comparison to those past laws that are being compared, but also the burdens that were and are currently being imposed by such laws. *See Prince*, 1:22-cr-00240, p. 16.

Clearly, this analysis is generally broad and can be interpreted with ease (nothing more than the switching out of a few words and the particular statute at hand as it applies to all analyses broadly). To wit, it is a *transferable* analysis and § 922(g)(5) deserves the same, or similarly detailed analysis as § 922(g)(1) when considering undocumented immigrants as part of "the people" with rights under the Second Amendment. And while this Court has already begun the proper analysis under *Bruen*, it is only proper that the analysis be expanded even further to correlate with the detailed analysis demanded by both *Range* and *Atkinson* (and most recently, *Prince*). *See Memorandum Opinion and Order from this Court 12/19/22*, pp. 3-6 (considering the plain text as well as historical and traditional analogies generally, yet not arising to the same level of intricate discussion as that of *Range*, *Atkinson*, or *Prince*).

For instance, in this case, the question falls on the difference between an individual that wilfully and voluntarily entered the United States unlawfully as an adult (and has therefore *refused* to pledge allegiance to the United States) versus someone who was brought here at a young age and involuntarily, at no fault of their own (and, while having no opportunity to pledge such formal and legal allegiance, has nevertheless become part of a whole sub-group of undocumented immigrants that has pledged allegiance to the United States of America every day for years while they attended public grammar school with their American-born classmates). *See* Defendant's Affidavit, Dkt. 71-1 (attesting to Mr. Carbajal-Flores' daily pledge of allegiance to the United States while in grammar school). Additionally, there is the issue of legal permanent residents of the United States (aka- "Green Card Holders") and those here on a visa, who are as well non-citizens exempt from taking an oath of allegiance, and without the right to vote, but are nevertheless given rights under the Second Amendment. These distinct groups of individuals alone are enough to show that not all immigrants (even those that are undocumented) are equally yoked.

And just like the courts in both *Range* and *Atkinson* asked the difficult questions about the differences in felons, their circumstances, and other relevant factors necessary when considering a challenge to § 922(g)(1), this Court is now tasked with the very same analysis of "the people" but with regard to undocumented immigrants being considered under § 922(g)(5). The identity of those stripped of their right to bear arms may be different, but the analysis and the

question of who is included as "the people" under the Second Amendment remains the same (or very much similar). This Court must partake in the same in-depth analysis as those of *Range* and *Atkinson*, relying on their reasoning to create a similar analysis for § 922(g)(5). And similarly, this Court should follow *Prince*'s guidance on how to consider the historical and traditional undertaking of the analysis. In doing so, this Court will find that Mr. Carbajal-Flores, and other such individuals like him, much like those in *Range* and *Atkinson*, are not the types of individuals that should have their right to bear arms stripped away despite the general language of the governing prohibitory statutes.

As it applies to undocumented immigrants generally, and because *Bruen* did nothing to address the meaning of "the people", this Court has already properly concluded that "'[n]o language in the Amendment supports [ ] a conclusion' that noncitizens are excluded from 'the people' protected by the Bill of Rights." *See Memorandum Opinion and Order from this Court 12/19/22*, p. 3 (quoting *United States v. Meza-Rodriguez*, 798 F.3d 664, 672 (7th Cir. 2015); *see District of Columbia v. Heller*, 554 U.S. 570, 580 (2008) (explaining that "the people" as it is used throughout the Constitution, "unambiguously refers to all members of the political community, not an unspecified subset"); *Bruen*, 142 S. Ct. at 2157 (concurring in his opinion, Justice Alito noted that the Court's decision in *Bruen* "decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun"). *But see United States v. Perez*, 6 F.4th 448 (2d Cir. 2021), *cert. denied,* 142 S. Ct. 1133, 212 L. Ed. 2d 20 (2022), *United States v. Torres*, 911 F.3d 1253 (9th

Cir. 2019), *United States v. Huitron-Guizar*, 678 F.3d 1164 (10th Cir. 2012), and *United States v. Jimenez-Shilon*, 34 F.4th 1042 (11th Cir. 2022) (assuming, without specifically deciding, that the Second Amendment does not apply to unauthorized noncitizens). Nevertheless, this Court held that it would "not 'place more weight on these passing references than the Court itself did'" and ultimately determined, without further analysis, that "unauthorized noncitizens possess no right to bear arms." *See Memorandum Opinion and Order from this Court 12/19/22*, p. 4 (quoting *Bruen*, 142 S. Ct. at 2134 (opting to skip such an analysis because, in the case of *Bruen*, there was no such reasons for the analysis as it was "undisputed that petitioners … are part of 'the people'). Yet, unlike the individuals in *Bruen*, the analysis here, as it applies to undocumented immigrants (i.e., "unauthorized noncitizens", as this Court refers to them), is not at all as straightforward as the *Bruen* analysis as it is not so undisputed here that such individuals are, or are not, part of "the people." And, the addition of the detailed analysis in both *Range, Atkinson,* and *Prince* is absolutely necessary to aid in picking up where the *Bruen* court left off where such an analysis is needed.

Accordingly, the Government's argument that Mr. Carbajal-Flores is not part of a political community, and thus undeserving of certain constitutional protections and rights, is inaccurate for a number of reasons. *See Government's Response Brief*, pp. 12-17; *see also United States v. Meza-Rodriquez*, 798 F.3d 664, 669 (7th Cir. 2015) ("While some of *Heller*'s language does link Second Amendment rights with the notion of 'law-abiding citizens' and 'members of the political community,' those

passages did not reflect an attempt to define the term 'people'".) (internal citations omitted). *But see Prince*, 1:22-cr-00240, p. 14 ("The legislature even disarmed free, Christian, white colonists (i.e., the core of the political community) whom the authorities believed they could not be trusted to obey the law, such as Loyalists.") (citing *United States v. Jackson*, 69 F.4th 495, 503 (8th Cir. 2023) (citing *4 Journals of the Continental Congress* 1774-1789, at 205 (Worthington Chauncey Ford ed., 1906); Act of Mar. 14, 1776, ch. 21, 1775-76 Mass. Acts. 479; Act of May 1777, ch. III, 9 *The Statutes at Large: Being a Collection of all the Laws of Virginia* 281-82 (1821); Act of June 13, 1777, ch. 756 §§ 2-4, 1777 Pa. Laws 110, 111-13; Act of June 1776, 7 *Records of the Colony of Rhode Island and Providence Plantations in New England* 567 (1862); Act of Nov. 15, 1777, ch. 6, 1777 N.C. Sess. Laws 231; Act of Sept. 20, 1777, ch. XL, 1777 N.J. Laws 90)).

In fact, there are several aspects about Mr. Carbajal-Flores' personhood and status within the United States that place him squarely within the bounds of a political community. To begin with, and in general, it is worth noting that non-citizens are in fact members of the broad political community, despite not being a part of the electorate. Despite not being allowed the right to vote, these such individuals nevertheless possess other political rights that are equally important, inclusive of Fourth Amendment privacy protections, as well as First Amendment protections of freedom of speech, which the Supreme Court has made clear serves the "major purpose" of protecting "discussion of government affairs." U.S. Const. Amends. I, IV. Such individuals enjoy such rights because they are part of "the

people" under the Constitution and, despite such individuals having a lesser amount of constitutional rights and protections at times or in certain circumstances, they nevertheless remain under the Constitution's purview of protections. *See, e.g.*, *Hudson v. Palmer*, 468 U.S. 517, 526 (1984). Indeed, if undocumented immigrants were not part of the political community, the very notion of them having representatives to petition in the first place would be irrelevant.

Further, undocumented non-citizens are included in the United States Census, which is quite literally the basis for determining the local political community, as well as the political districts that represent them. *See* United States Census Bureau, Frequently Asked Questions (FAQs), https://www.census.gov/topics/public-sector/congressional-apportionment/about/faqs. html#:~:text=Are%20unauthorized%20immigrants%20included%20in,resident%20p opulation%20for%20the%20census (all people–citizens and noncitizens alike–"with a usual residence in the United States are included in the resident population for the census"); *see also* Protection for Immigrants, C-Span Created by Cable in 1979, www.c-span.org/video/?458529-1/protection-immigrants (detailing a Congressional House Judiciary Committee hearing, in which certain undocumented immigrants who were brought to the United States as children were able to testify before the congressional body in support of protections for immigrants). In general, the Government seeks to interpret "the people" and "political community" to mean the same thing as "electorate," but those are entirely different words with different meanings. Today, there continues to be substantial overlap between the terms, but

for most of United States history (and especially during the Founding era), the terms remained distinct. For instance, during the Founding Era, women were not included as the "electorate", yet were still considered to have the right to bear arms. It follows then that the founders understood the Second Amendment to extend beyond just the electorate. And clearly, any group of individuals important enough to be included in the Census, and asked to testify before Congress, among other things, is demonstrative of a "political community" with the importance, rights and obligations that come with such a community.

On top of a general understanding that Mr. Carbajal-Flores belongs in a "political community" that is afforded various rights under the Constitution, the personal details only add to such a conclusion. Upon Mr. Carbajal-Flores having been brought to the United States by his mother at the young age of ten (10), Mr. Carbajal-Flores' grandfather Alfredo Flores (a United States citizen himself) filed a immigrant family petition in January of 2001 on behalf of both Mr. Carbajal-Flores and his mother which was grandfathered under 8 U.S.C. § 1255(i). Essentially allowing Mr. Carbajal-Flores to adjust his immigration status to legal permanent resident (green card holder) at a later date without leaving the United States, so long as certain criteria are met.[1] To date, Mr. Carbajal-Flores is working to legalize

---

[1] 8 U.S.C. § 1255(i) is a section of the United States Code that allows for the "[a]djustment in status of certain aliens physically present in the United States." 8 U.S.C. § 1255(i). Specifically,

> (i) Adjustment in status of certain aliens physically present in United States
>     (1) Notwithstanding the provisions of subsections (a) and (c) of this section,
> an alien physically present in the United States–
>         (A) who–
>             (i) entered the United States without inspection; [ ]
>             (ii) . . . .;

his status, as is his right pursuant to 8 U.S.C. § 1255(i). He is now married to a U.S. Citizen, who has filed a petition on his behalf, and he can now utilize the his grandfather's grandfathered petition to legalize his status under 8 U.S.C. § 1255(i).

Further, Mr. Carbajal-Flores is part of a large political group of non-citizen immigrants that are legally authorized to work in the United States. And, because Mr. Carbajal-Flores did not have a choice in unlawfully entering the United States when he was merely ten (10) years old, he is further placed within the bounds of, and thus would have qualified for the benefits of, a group that has been coined "DREAMers" under the Development, Relief and Education for Alien Minors (DREAM) Act. The ongoing executive and legislative challenges attempting to codify relief for such individuals makes it clear that its members are a "political community" in and of itself. *See DACA*, National Immigration Law Center, http://www.nilc.org/issues/daca/ (discussing ongoing litigation surrounding

---

(B) who is the beneficiary (including a spouse or child of the principal alien, if eligible to receive a visa under section 1153(d) of this title) of–
(i) a petition for classification under section 1154 of this title that was filed with the Attorney General **on or before April 30, 2001**; or
(ii) . . . .; and
(C) who, in the case of a beneficiary of a petition for classification, . . . , described in subparagraph (B) that was filed after January 14, 998, is physically present in the United States on December 21, 2000; may apply to the Attorney General for the adjustment of his or her status to that of an alien lawfully admitted for permanent residence. The Attorney General may accept such application only if the alien remits with such application a sum equaling $1,000 as of the date of receipt of the application[.]
(2) Upon receipt of such an application and the sum hereby required, the Attorney General may adjust the status of the alien to that of an alien lawfully admitted for permanent residence if–
(A) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence; and
(B) an immigrant visa is immediately available to the alien at the time the application is filed.

8 U.S.C. § 1255(i).

DREAMers and the constitutionality of President Barack Obama's executive order creating the Deferred Action for Childhood Arrivals (DACA) program). Mr. Carbajal-Flores is clearly part of at least one, if not more, protected "political communities" for the purpose of Constitutional rights, inclusive of those under the Second Amendment. Denying such a reality is akin to denying the true demographic layouts that represent America today.

Continuing forward with the analysis, and applying the same reasoning as those courts in *Range* and *Atkinson*, such a rightfully-detailed analysis will find that there does exist certain undocumented immigrants with no suitable past analogy or twin that exists to justify the stripping away of those individuals' Second Amendment rights, if not to be said for all undocumented immigrants. *See Prince*, 1:22-cr-00240, p. 10 ("Under *Bruen*, the government has the authority to regulate presumptively protected conduct under the Second Amendment when it can demonstrate that the statute is part of this nation's historical tradition of firearm regulation.") (citing *Bruen*, 142 S. Ct. at 2127). *Bruen*'s analysis offers two ways of dealing with the issue of determining comparative historical traditions. In a "straightforward historical inquiry," the Government can meet its burden by identifying a "distinctly similar historical regulation" that addresses a "general societal problem that has persisted since the 18th century." *Bruen*, 142 S. Ct. at 2131; *see Prince*, 1:22-cr-00240, p. 11 ("This court separately analyzes the burdens of and justifications for each type of historical regulation to determine whether [the regulation at issue] imposes a comparable burden on the right of armed self-defense

and whether that burden is comparably justified."); *see, e.g.*, *United States v. Johnson*, No. 18-CR-00458, 2023 WL 6690388 (N.D. Ill. Oct. 12, 2023); *United States v. Johnson*, No. 23-CR-156, 2023 WL 6276562 (N.D. Ill. Sept. 26, 2023); *United States v. Gates*, 22-CR-00397-1, 2023 WL 5748362 (N.D. Ill. Sept. 6, 2023). However, if there are no such past regulations to compare, and the regulation is considered "distinctly modern," the Government may offer a historical regulation that is "relevantly similar." *Id.* at 2132. In this case, the Government cannot meet its burden of showing that this is a "straightforward historical inquiry," nor can it show that such a "relevantly similar" historical regulation exists to be compared to a "distinctly modern" regulation at hand. Here, the Government has attempted to provide the following comparative historical regulations: (1) laws that denied such a right to individuals that entered the country unlawfully and did not swear an oath of allegiance to the United States; and (2) laws denying those deemed outside the scope of a "political community." *See Government's Response Brief*, pp. 8-24; *see also United States v. Sitladeen*, 64 F.4th 978, 985-87 (8th Cir. 2023) (holding that immigrants who are unlawfully in the United States "are not part of 'the people', however, the Eighth Circuit did not consider subcategories of such entrants that took no voluntary part in such entry); *United States v. Pineda-Guevara*, No. 5:23-CR-2-DCB-LGI, 2023 WL 4943609, at *6 (S.D. Miss. Aug. 2, 2023) (denying rights to those who unlawfully entered, yet no distinction between those who voluntarily entered versus involuntarily); *United States v. Medina-Cantu*, No. 22-cr-426, Dkt. 19 at 10 (S.D. Texas Jan. 10, 2023) (same); *United States v.*

*Escobar-Temal*, No. 3:22-CR-00393, 2023 WL 4112762, at **3-6 (M.D. Tenn. June 21, 2023) (requiring an oath of allegiance in order to keep and bear arms, while also noting that the Constitution "may, in certain circumstances, encompass unlawfully present aliens"). However, such arguments fail as it applies to the instant case for a number of reasons.

Mr. Carbajal-Flores belongs to a particular sub-group of undocumented immigrants that should not be subject to § 922(g)(5) restrictions. Specifically, and in addition to the above-noted arguments inferring Mr. Carbajal-Flores' involvement in one or more "political communities," accordingly, there are no such comparable analogies or twins to § 922(g)(5) that apply to permanently strip undocumented immigrants of their right to bear arms generally, nor as-applied to certain sub-groups within such undocumented immigrants. *See Prince*, 1:22-cr-00240 (finding no "relevantly similar" historical analogue to the § 922 restrictive statues that supports *permanent* prohibition of possessing a firearm by those restricted under the language and emphasizing the required inquiry under *Bruen* is, however, not merely whether a dispossession statute's burden is "comparably justified," but also whether the statute imposes a 'comparable *burden*' on the right itself." *Bruen*, 142 S. Ct. at 2133 (emphasis added)). When tasked with such an analysis of history and tradition, the courts in *Range* and *Atkinson* (and subsequently, *Prince*) decided that, as it applies to the circumstances before them, a comprehensive review of history and tradition in the United States concluded that no such analogous circumstances existed to justify restriction of gun rights when it applied to those

particular "felons." *See Prince*, 1:22-cr-00240, p. 13 ("Importantly, although Catholics, enslaved people, and Native Americans were prohibited from firearm possession, individuals within these groups could possess firearms under certain circumstances", and further, "state legislatures typically prohibit the sale of firearms to Native Americans, *not possession itself*" despite the belief that Native American tribes were considered hostile foreign nations and, accordingly, not included in "the people") (emphasis added) (citing *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1047 (11th Cir. 2022)); *see, e.g., Laws and Ordinances of New Netherland*, 1638-1674, at 18-19 (1868) (1639 New Netherland law); *Records of The Colony of New Plymouth in New England*, at 243 (1856) (1675 Plymouth law).

More specifically, the court in *Prince* noted the insufficient comparison with loyalty oath laws that prohibited "untrustworthy" individuals from bearing arms due to their lack of oath, to the prohibitory regulations under § 922 for *permanent* disarmament. *See* 1:22-cr-00240, p. 17. Specifically, the court noted that such past individuals were given a way to regain their right to keep and bear arms, thus making such restrictions of a temporary nature, as opposed to § 922 restrictions which are otherwise permanent. *Id.* And as it applies to those immigrants who were brought here by another unlawfully, unlike those disarmed in the past, such individuals have no avenue (as of yet) to take such a necessary legal oath, and therefore gain their right to bear arms. *Id.* Yet regardless, just like the court in *Prince* when deciding § 922(g)(1), this Court should most certainly conclude that § 922(g)(5) similarly "imposes a far greater burden on the right to keep and bear arms

than the historical categorical exclusions from the people's Second Amendment." *Id.* To which the *Prince* court noted, "[t]he government has not demonstrated why the modern ubiquity of gun violence, and the heightened lethality of today's firearm technology compared to the Founding, justify a different result." *Id.* And, despite the devastating effect of our nation's gun violence problem, such a problem does not change the fact that the *Bruen* analysis "rests on the severity of § 922 [ ] rather than its categorical prohibition." *Id.*

Additionally, this Court must acknowledge that, as it applies to implementation of § 922(g)(5) to undocumented immigrants, not all immigrants under this subsection are exactly alike and, therefore, deserve an analysis that considers just this. Many, like Mr. Carbajal-Flores, did not enter the United States unlawfully voluntarily. Additionally, Mr. Carbajal-Flores, and many similarly situated, possess an otherwise clean record and history outside of their undocumented status, possess authorizations to work and otherwise, and take substantial steps to legalize their immigration status, despite the Government's argument that such individuals are unwilling to adhere to legal conventions or take an oath of allegiance. Nevertheless, they have pledged their allegiance to the United States *daily and for years* right alongside their American-born classmates, and if given the opportunity, would pledge such *legal* allegiance as well. *See Kanter v. Barr*, 919 F.3d 437, 456-58 (finding that Catholics who were "'willing to swear undivided allegiance to the sovereign' were permitted to keep their arms"); *see also The Laws of Maryland, With The Charter, The Bill of Rights, The Constitution of*

*The State, and Its Alterations, The Declaration of Independence And The Constitution of The United States, And Its Amendments*, at 117-18 (1811) (1715 Md. Law) (allowing enslaved people to possess firearms so long as they had permission from their master). *But see* Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 45 (1994) (noting the categorical disarming of nonconformist groups that *specifically refused* to take an oath of allegiance to the Church of England, which was under the rule of the King of England); *Church of England*, BBC (June 30, 2011), https://www.bbc.co.uk/religion/religions/christianity/cofe/cofe_1.shtml (same); *An Act for the Better Securing the Government by Disarming Papists and Reputed Papists*, 1 W. & M., Sess. 1, ch. 15 (1689) (denying the right to bear arms to Catholics that *categorically refused* to take an oath of allegiance to the Protestant government over their oath to the Pope); *see also Kanter v. Barr*, 919 F.3d 437, 456-57 (7th Cir. 2019) (Barrett, J., dissenting) (same). Further, such individuals utilizing and holding legal work authorizations in the United States additionally cements their ties to the community and government. Taking these things collectively, such individuals need to be considered separately from those undocumented immigrants that, for instance, entered the United States willingly without inspection, remained undocumented and took no steps to offer any form of allegiance, commitment or conformity to their community and government, and lived a life of crime and anarchy. These are separate and distinct sub-categories of undocumented immigrants, and should be analyzed as such.

The Government takes considerable time in its Response Brief to discuss what it deems analogous historical traditions surrounding the disarming of groups of people that refused to take oaths of loyalty to the government, equating it to today's obligation that undocumented immigrants take an oath and become a naturalized citizen before being able to bear arms under the Second Amendment. *See Government's Response to Defendant's Renewed Second Motion to Dismiss Indictment*, pp. 12-24 (arguing that Mr. Carbajal-Flores is not a member of the political community nor can he be trusted to adhere to the law solely because of his undocumented status, and thus poses a danger to society).[2] However, no historical analogies exist that address those individuals that, aside from their undocumented status alone, are law-abiding, and while they are not *rejecting* the act of pledging loyalty to the government, they merely have never had, nor do they now have, the opportunity to commit to such a pledge.[3] *See* 4 Journals of the Continental Congress, 1774-1789, at 205 (Worthington Chauncey Ford ed., 1906) (disarming people *who refused* to declare an oath of loyalty); Joyce Lee Malcom, To Keep and

---

[2] Notably, this argument sinks immediately when considering such noncitizens as those with green card status, all of which are legal permanent residents (yet, not citizens), who possess no right to vote, yet coincidentally, possess the right to bear arms under the Second Amendment. *See* 18 U.S.C. § 922(y)(2) (codifying a green-card holders' and those in the country on a visa the right to purchase and bear arms).

[3] Having been brought to the United States involuntarily, as a minor, the individual is essentially stripped of the ability to apply for asylum or citizenship, among other things, as they are under the control of another individual(s), and therefore do not understand or are given the opportunity for such obligations during the requisite timeframes to take such oaths. By means of executive orders and the continuous acts of those in Congress, we continue to attempt to put forth a pathway for citizenship for these particular individuals as they are only of undocumented status because of the actions of another person, and aside from that, they are upstanding, law-abiding members of our country's fabric. *See Second Motion to Dismiss* (discussing the Development, Relief and Education for Alien Minors (DREAM) Act. While our legislature may still be working to play catch-up to the reality that is America today, it is only a matter of time, and such individuals will soon be granted all the same rights afforded to other such citizens of the United States that were lucky enough to have been born here.

Bear Arms: The Origins of an Anglo-American Right 45 (1994) (disarming non-Anglican Protestants who *refused* to participate in the Church of England); 1 W. & M., Sess. 1, c. 15 (1688) (forbidding ownership of firearms by Catholics who *refused* to renounce their faith); Saul Cornell & Nathan DeDino, A Well Regulated Right: The Early American Origins of Gun Control, 73 Fordham L. Rev. 487, 506 (2004) (disarming individuals during the American Revolution who *refused* to "swear an oath of allegiance to the state or the United States); *see also Government's Response Brief*, p. 14 (discussing forbiddance of arming Native American, as well as Catholics, "unless they swore 'allegiance to the Hanoverian dynasty and to the Protestant succession,' *see* Robert H. Churchhill, Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment, 25 L. & Hist. Rev. 139, 157 (2007)"); Churchill, *supra* at 159 ("[T]he new state governments . . . framed their police power to disarm around a *test of allegiance*" that was offered to current residents); *but see* 18 U.S.C. § 922(y)(2) (codifying green-card holders' and those here on a temporary visa the right to purchase and bear arms). In other words, there is a significant difference between someone who *refuses* to pledge loyalty versus someone who is *prevented* from pledging loyalty. As such, many immigrants fall into this later category. Mr. Carbajal-Flores specifically is more than willing to pledge an oath of allegiance if given the opportunity, and would even do so under the purview of this Court, in open court, given the opportunity to do so by the Government.

Furthermore, the Government additionally fails to take into consideration the voluntary action taken by Mr. Carbajal-Flores during his days in grammar school where he daily pledged his allegiance to this country and its flag–and, while the Government may very well attempt to discredit such an action, it is nevertheless, the same pledge of allegiance to this country that ultimately gave those restricted in the past back their right to bear arms. *See Defendant's Affidavit* Dkt. 71-1; *see also supra*. Additionally, despite some such actions being initiated following his arrest in this present case, Mr. Carbajal-Flores has nevertheless taken a number of steps in an attempt to legalize his status. Specifically, Mr. Carbajal-Flores currently possesses United States Employment Authorization, and he has filed an application for cancellation of his removal. Additionally, Mr. Carbajal-Flores's wife has filed a petition on his behalf based on his marriage to a United States citizen, and he is currently attempting to adjust his immigration status to that of a permanent resident based on the petition in 2001 from his grandfather.[4] All of these actions further suggest Mr. Carbajal-Flores' loyalty to the country he has called home the vast majority of his life.

Accordingly while our legislature continues to attempt to catch up on laws addressing such individuals, there nevertheless remains hundreds of thousands of individuals that only know America as their home but, because they were brought here by another when they were of minor age, they now have no avenue to formally pledge their allegiance, despite many of them being willing and ready to do so, and

---

[4] *See* 8 U.S.C. § 1255(i) (allowing for adjustment of immigration status at a later date, so long as certain criteria are met).

having done so in action and orally for years. Witnessed by the evolution of legislation such as the DREAM Act that has found an audience in Congress, we are clearly in uncharted territory as there have never been similar circumstances for individuals in the same position. *See id.* Offering citizenship to such individuals (and further the right to bear arms) is in fact more comparatively similar to past regulations than restrictive laws of such individuals, as the Government attempts to argue. Such a thought further affirms that these such groups of undocumented immigrants are in fact a part of the political community that can be trusted to adhere to laws (despite the one blemish of not having citizenship to no fault of their own) and deserve the same rights as those with citizenship.

This Court has already determined Mr. Carbajal-Flores to be part of "the people" under the Second Amendment, and the Government cannot show specific analogous historical traditions as it applies to striping away the right to bear arms from individuals that are otherwise law abiding (and allegiance pledging) residents of the United States that were merely brought here, by the will of another, at no fault of their own.[5] Further, in an as-applied challenge to § 922(g)(5), Mr.

---

[5] It is extremely significant to note the *Prince* court's emphasis on the fact that the government, in that case, and just like here, compounds its unmet burden by not offering any form of expert historian testimony. *See Prince*, 1:22-cr-00240, p. 21, note 8. Specifically, that court noted:

> The government's unmet burden is compounded by its decision not to offer any expert historian. As another district court stated in *United States v. Bullock*, No. 3:18-CR-165-CWR-FKB, 2023 WL 4232309, at *17, 31 (S.D. Miss. June 28, 2023), the "historical community's guidance and expertise" is likely to aid courts in their analyses under *Bruen*, although the holding in *Bullock* (that § 922(g)(1) was unconstitutional as applied to the defendant, who completed his sentence for aggravated assault and manslaughter over 15 years prior) is limited to the facts of the case. It is not the court's burden to demonstrate history and tradition in this case by appointing its own independent expert, and the Court stated in *Bruen* that courts should "follow the principle of party presentation" and are "entitled to decide a case

Carbajal-Flores has demonstrated himself to be the type of individual that should be afforded the same right to bear arms as others. He has a history of consistently remaining in the same geographical area, where he contributes to his community through gainful employment and serves as the household of his family. Further, he did not knowingly, voluntarily or intentionally unlawfully enter the United States, but rather was involuntarily brought here by an adult when he was only ten (10) years old–clearly not old enough to understand and navigate the immigration system to seek asylum or citizenship. And, very importantly, Mr. Carbajal-Flores has in fact taken the actions to pledge his allegiance to the United States in numerous ways, beginning while he was in grammar school as he pledged allegiance to the United States on a daily basis. His actions since then further demonstrate his desire and willingness to pledge his allegiance to the United States. To deny Mr. Carbajal-Flores the right to bear arms solely because of someone else's actions is unconstitutional both on its face and as an as-applied challenge. This Court should therefore join *Range*, *Atkinson* and, subsequently, *Prince* in finding categorical prohibitions under § 922(g) unconstitutional under *Bruen*'s instruction, as the Government has failed to "provide evidence of a

---

based on the historical record compiled by the parties." 142 S. Ct. 2111, 2130, n.6 (2022).

*Id.* (holding that "[b]ecause this court determines that defendant is a member of "the people" protected by the Second Amendment, and because neither type of historical regulation offered by the government satisfies its burden to show a history and tradition of "relevantly similar" analogues to § 922(g)(1)'s permanent, categorical firearm dispossession of all felons, the court is forced to grant defendant's motion to dismiss the indictment against him under *Bruen*, regardless of whether he is challenging the statute as applied or on its face").

historical analogue that is both comparably justified and comparably burdensome of the right to keep and bear arms." *Prince*, 1:22-cr-00240, p. 22.

Therefore, for the foregoing reasons, Mr. Carbajal-Flores respectfully requests that this honorable Court grant his Renewed Second Motion to Dismiss Indictment Under the Second Amendment of the U.S. Constitution; dismiss the underlying charge against him for reason of 18 U.S.C. § 922(g)(5)(A) being unconstitutional as it applies to him; and reinstate Mr. Carbajal-Flores' Second Amendment Constitutional right to bear arms. The Government has failed to show a history or tradition of an absolute ban on individuals based on alienage or nationality alone and, further, it has failed to prove such a regulation can apply to Mr. Carbajal-Flores.

DATED: November 6, 2023

Respectfully Submitted,


*/s/ Jacob Briskman*

Jacob Briskman
Jacob S. Briskman, Attorney-At-Law
2054 N. California Avenue
Chicago, IL 60647
Tel: (312) 945-6207
jacob.briskman@gmail.com
Counsel for Defendant

## <u>CERTIFICATE OF ELECTRONIC SERVICE</u>

The undersigned hereby certifies that he is an attorney of record for the Defendant and registered to file in the ECF system and that on November 6, 2023, he served an electronic copy of the above and foregoing **Motion** by electronic service (ECF) to the Assistant United States Attorney assigned on this case who is registered on ECF in this case to receive EService of all documents.

<u>/s/Jacob S. Briskman</u>
Jacob S. Briskman
Attorney-at-Law
2054 N. California Ave.
Chicago, IL 60647
Ph- (312) 945-6207
Fax- (773) 442-2117
jacob.briskman@gmail.com